[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13535

_____

D.C. Docket No. 4:16-cr-10052-JIC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HENRY VAZQUEZ VALOIS,
LUIS FELIPE VALENCIA,
DIEGO PORTOCARRERO VALENCIA,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(February 12, 2019)

Before JORDAN, GRANT, and HULL, Circuit Judges.

HULL, Circuit Judge:

Henry Vazquez Valois ("Vazquez"), Luis Felipe Valencia ("Valencia"), and

Diego Portocarrero Valencia ("Portocarrero") appeal their convictions and

sentences for trafficking cocaine in international waters, in violation of the Maritime Drug Law Enforcement Act ("MDLEA").  *See* 46 U.S.C. §§ 70501–70508.  Broadly speaking, they raise five issues on appeal.  After review and with the benefit of oral argument, we conclude that the defendants have shown no error, and we affirm their convictions and sentences.  We address each issue in turn.

## I.  MDLEA

All three defendants challenge the district court's exercise of extraterritorial jurisdiction under the MDLEA.[1]  Collectively, they argue that the MDLEA is unconstitutional for four reasons: (1) Congress's authority to define and punish felonies on the high seas does not extend to felonies without any connection to the United States; (2) due process prohibits the prosecution of foreign nationals for offenses that lack a nexus to the United States; (3) the MDLEA violates the Fifth and Sixth Amendments by removing the determination of jurisdictional facts from the jury; and (4) the admission of a certification of the Secretary of State to establish extraterritorial jurisdiction violates the Confrontation Clause.

As the defendants concede, each of these arguments is foreclosed by binding precedent.  Regarding the defendants' first argument, in *United States v. Campbell*, we held that the MDLEA is a valid exercise of Congress's power under the

---

[1]We review *de novo* a district court's interpretation of a statute.  *United States v. Cruickshank*, 837 F.3d 1182, 1187 (11th Cir. 2016).  Likewise, we review *de novo* whether a statute is constitutional.  *Id.*

2

Felonies Clause as applied to offenses without a nexus to the United States. 743

F.3d 802, 810 (11th Cir. 2014); *see also United States v. Cruickshank*, 837 F.3d

1182, 1187-88 (11th Cir. 2016) (following *Campbell* and reaching the same

holding). In *Campbell*, we recognized that we have upheld extraterritorial

convictions under our drug trafficking laws as an exercise of power under the

Felonies Clause. 743 F.3d at 810.

As to the defendants' second contention, in *United States v. Rendon*, we held

that the Due Process Clause of the Fifth Amendment does not prohibit the trial and

conviction of aliens captured on the high seas while drug trafficking because the

MDLEA provides clear notice that all nations prohibit and condemn drug

trafficking aboard stateless vessels on the high seas. 354 F.3d 1320, 1326 (11th

Cir. 2003). The defendants' MDLEA convictions do not violate their due process

rights even if the offenses lack a nexus to the United States. *Campbell*, 743 F.3d at

812.

Concerning the defendants' third argument, in *United States v. Tinoco*, we

held that the MDLEA jurisdictional requirement goes to the subject-matter

jurisdiction of courts and is not an essential element of the MDLEA substantive

offense, and, therefore, it does not have to be submitted to the jury for proof

beyond a reasonable doubt. 304 F.3d 1088, 1109-12 (11th Cir. 2002); *see also*

*Cruickshank*, 837 F.3d at 1192 (following *Tinoco* and reaching the same holding);

3

*Campbell*, 743 F.3d at 809 (following *Tinoco* and *Rendon* and reaching the same holding); *Rendon*, 354 F.3d at 1326-28 (following *Tinoco* and reaching the same holding).

As to the defendants' fourth argument, in *Campbell*, we held that the introduction of a certification of the Secretary of State to establish extraterritorial jurisdiction under the MDLEA does not violate the Confrontation Clause.  743 F.3d at 806-08; *see Cruickshank*, 837 F.3d at 1192 ("A United States Department of State certification of jurisdiction under the MDLEA does not implicate the Confrontation Clause because it does not affect the guilt or innocence of a defendant.").  In *Campbell*, we determined that because the stateless nature of the defendant's vessel was not an element of his MDLEA offense to be proved at trial, the admission of the certification did not violate his right to confront the witnesses against him.  743 F.3d at 806.

Based on our precedent, the district court properly exercised jurisdiction in this case.

## II.  MOTION FOR MISTRIAL

Next, defendant Valencia argues that the district court abused its discretion when it denied a motion for a mistrial based on the government's reference in

closing arguments to a separate drug seizure.[2]  Vazquez and Portocarrero adopt this argument.

## A.

We begin by summarizing the evidentiary context for the prosecutor's comments.  Over a 36-hour period in November 2016, the U.S. Coast Guard Cutter *Dependable* interdicted two separate go-fast vessels, each with three individuals onboard, trafficking cocaine in international waters off the coasts of Panama and Costa Rica.  The first vessel was seized overnight on November 23 to November 24.  The Coast Guard recovered 16 bales of cocaine from the water after the individuals on the first vessel had jettisoned the bales.  This group of individuals was indicted and prosecuted for this drug trip independently from this case.

The three defendants in this case were on a second vessel seized during the day on November 25, about 36 hours after the first vessel was seized.  The defendants in this group were the only individuals charged in this indictment.  At trial, Valencia tried to sow doubt about whether he, Vazquez, and Portocarrero were trafficking cocaine onboard their vessel.  There was testimony at trial that on November 25 the defendants here had jettisoned 16 bales of cocaine, which the Coast Guard retrieved from the water.  By the time the Coast Guard got to the

---

[2]We review for abuse of discretion the denial of a motion for a mistrial.  *United States v. McGarity*, 669 F.3d 1218, 1232 (11th Cir. 2012).

defendants' vessel, no cocaine was found onboard the vessel itself.  Valencia therefore attempted to show that the Coast Guard mistakenly attributed the cocaine from the first seizure to the defendants in this case.

To that end, Valencia's defense counsel, over the government's objections, repeatedly cross-examined government witnesses about the prior seizure that had happened 36 hours earlier.  The government objected on relevance grounds and because the questions were beyond the scope of direct examination.  Vazquez and Portocarrero did not object to this line of questioning from Valencia's defense counsel, and the district court overruled the government's objections.

More specifically, on cross-examination, Valencia's defense counsel asked one government witness about how close in time the prior seizure was, whether he was patrolling in the same area, whether individuals were detained, how many packages were retrieved, and whether and when the packages were tested for cocaine.  The witness answered that he was involved in another operation with a go-fast boat overnight on November 23 to November 24, approximately 24 to 36 hours before interdicting the defendants' vessel.  He stated that the prior seizure occurred in the same area in the Eastern Pacific that he was patrolling and that he had detained individuals.  He stated that there were no drugs on the earlier vessel because the vessel was sinking when the Coast Guard approached.  He answered

that the Coast Guard retrieved 16 bales from the water in the earlier case, and he tested those bales for cocaine on November 24 and 26.

Valencia's defense counsel also asked another government witness whether he personally was able to find the debris field of packages from the prior seizure on November 23 to November 24. The witness answered that he personally was not able to find the debris field, but that the Coast Guard did find the debris field in the vicinity of where the individuals on the earlier vessel jettisoned the bales. The witness also stated that he saw at least one individual jettisoning the bales off the defendants' vessel in this case.

Valencia's defense counsel asked another government witness whether the packages from the prior seizure were packaged similarly to those from this case and whether 16 packages were recovered from each seizure. The witness answered that the bales from the earlier seizure looked very similar and had similar multicolored packaging to the bales in this case. He stated that there were 16 bales recovered from the earlier seizure on November 23 to November 24 and another 16 bales recovered on November 25 as part of the second seizure.

On redirect, the prosecutor invariably tried to make clear that the witnesses were not mistaken that the cocaine retrieved from the water on November 25 had come from the defendants' vessel in this case.

Notably, in addition to not objecting to the cross-examination by Valencia's defense counsel, Vazquez's defense strategy aligned with Valencia's in that Vazquez denied having any cocaine on his boat. Specifically, at trial, Vazquez testified in his defense that he owned the go-fast vessel and that he had hired Valencia and Portocarrero to help him flee Colombia to escape death threats from individuals who had demanded he pay a "tax" on the boat. Vazquez testified that there was never any cocaine on his vessel and that he did not transport cocaine. In other words, the cocaine found in the water came from the first vessel seized.

With this evidentiary context in mind and Valencia's interjection of the first vessel into evidence in the trial, we now turn to the prosecutor's comments in closing arguments. Responding to Vazquez's testimony, the prosecutor referenced the prior seizure and suggested that both go-fast vessels were part of a "concerted effort" that was "being directed by whoever was orchestrating these deliveries to Central America." The prosecutor asserted that the defendants' vessel "followed the exact same procedures as that first boat had done," including attempting to elude the Coast Guard, jettisoning the cargo, and then scuttling the vessel. These activities, according to the prosecutor, showed that the defendants "were following the instructions of the people who hired them and directed their activities," just like the individuals on the other vessel. The prosecutor also argued that the 640

8

kilograms of cocaine recovered from the water by the Coast Guard came from the defendants' vessel and not from the prior seizure the night before.[3]

During the prosecutor's argument, defense counsel for Valencia reserved a motion and, once the prosecutor concluded, moved for a mistrial outside of the presence of the jury. Valencia argued that the government appeared to be trying to tie the defendants to a broader conspiracy and to hold them accountable for the first drug seizure. Defense counsel for Vazquez and Portocarrero did not explicitly object to the prosecutor's comments or join in Valencia's mistrial motion on the record. However, Vazquez's defense counsel did assist Valencia's defense counsel with the argument on the motion.

As to Valencia's mistrial argument, the prosecutor responded that he was simply trying to place the other seizure—which Valencia "interjected into this trial" and made "a primary feature of his defense"—in context of the overall scheme.

After hearing from the parties, the district court found that "an appropriate curative instruction would ameliorate any potential harm to any defendant" and that none of the defendants "ha[d] been deprived [of] their right to a fair and impartial trial." Valencia's counsel conferred with the other defense counsel and

---

[3]The 16 bales totaled 640 kilograms of cocaine.

prepared a curative instruction.  The prosecutor did not object to the instruction.

The district court then read the curative instruction to the jury as follows:

> During the trial you heard evidence of acts allegedly done by other individuals on other occasions that may be similar to acts with which the defendants are currently charged.  You must not consider any of this evidence to decide whether the defendants engaged in the activity alleged in the indictment.

After the prosecutor's closing argument and the district court's curative instruction, defense counsel gave their closing arguments.  Vazquez's defense counsel argued that the Coast Guard did not see the first bale in the water thrown off the defendants' boat, but the Coast Guard immediately attributed it to the defendants' boat.  Vazquez's counsel contended that the Coast Guard did not have any video showing any of the 16 bales of cocaine being thrown off the defendants' boat.  Vazquez's counsel argued that just because the Coast Guard recovered 640 kilograms of cocaine and Vazquez's boat was in the proximity of where the cocaine was recovered did not put that cocaine on Vazquez's boat or mean that the cocaine was his.

Portocarrero's defense counsel argued that as soon as the Coast Guard saw a bale in the water, the Coast Guard claimed that the defendants were jettisoning the bales from their boat and that the bales belonged to the defendants, even though many of the witnesses did not see bales being tossed off the defendants' boat and the video did not record any jettisoning of bales.  Portocarrero's counsel argued

10

that the conflicting evidence and lack of details in the case showed without a doubt that nobody was throwing bales off the defendants' boat. Specifically, he argued that the Coast Guard could not state how many bales they saw jettisoned off the defendants' boat or who was jettisoning the bales, even though the bales were brightly colored. Portocarrero's counsel also contended that the physical evidence showed that the debris field of bales did not trail the defendants' boat. Also, he argued that there was no evidence the defendants had cocaine in their boat, as there was nothing on their boat that could be connected to the cocaine found in the water. Portocarrero's counsel argued that if there was cocaine on the defendants' boat, there would have been evidence of it.

In turn, Valencia's defense counsel argued that the jury could consider that the government witnesses who he questioned about the prior seizure became defensive or unhappy when he asked them about the prior seizure. Valencia's counsel also argued about the similarities between the prior seizure and the instant case, including that 16 bales were also recovered from the prior seizure and they had the same packaging as those in this case. Valencia's counsel argued that the boat from the prior seizure could have carried 16 bales of cocaine, but the boat in this case would have been over maximum load. He argued that the boat from the prior seizure could have carried and jettisoned all 32 bales of cocaine, including the 16 bales mistakenly attributed to the defendants. He contended that there was

11

reasonable doubt that Valencia, Vazquez, and Portocarrero were transporting 16 bales of cocaine.  Once again, Vazquez's and Portocarrero's counsel did not object to the argument of Valencia's counsel that the cocaine in the water came from the first vessel, not the defendants' boat.

In the prosecutor's rebuttal argument, the prosecutor argued that the government witnesses testified that they did not confuse what happened with the prior seizure with the instant case.

## B.

The defendants assert that the prosecutor's reference to the earlier seizure amounted to the introduction of improper evidence under Federal Rule of Evidence 404(b), for which no notice had been given.  We disagree.  For starters, "statements and arguments of counsel are not evidence." *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009) (quotations omitted).  More importantly, it was Valencia who interjected the prior seizure, which involved other individuals, into the trial as part of his defense.  Neither Vazquez nor Portocarrero objected to Valencia's introduction of evidence about the prior seizure.  Indeed, it was only the government that opposed that effort.  Because this evidence was not introduced by the government and did not concern a prior bad act by any of the defendants, Rule 404(b) and its notice requirements did not apply.

12

To the extent the defendants argue more generally that the prosecutor's comments in closing were improper suggestions that the two seizures were connected, they must prove two things: (1) that the remarks were improper; and (2) that the remarks prejudicially affected their substantial rights. *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014). The prosecutor understandably desired to refute Vazquez's story of no cocaine on his boat and to respond to the considerable testimony Valencia elicited regarding the details of the other seizure and how similarly the cocaine was packaged. Moreover, the prosecutor had objected to the defendants presenting evidence about the prior seizure, but the district court had allowed the evidence, which showed that 16 bales of cocaine similarly packaged had been seized 36 hours earlier. While one possible inference was that the second 16 cocaine bales seized came from the first boat, another possible inference, as the prosecutor argued, was the two vessels were doing the same activity in the same way and were connected. Given the way the trial proceeded, we cannot say the prosecutor's brief comments in closing were improper.

Even if we assume *arguendo* that the prosecutor's comments were somehow improper, the defendants have not proved prejudice to their substantial rights. The district court cured the complained-of remarks through a clear and specific limiting instruction to the jury. *See Lopez*, 590 F.3d at 1256 ("If the district court takes a

13

curative measure, we will reverse only if the evidence is so prejudicial as to be incurable by that measure."). The court told the jury that it could not consider the evidence of the other drug seizure when deciding whether the defendants engaged in the activity of the second vessel alleged in the indictment. "We presume that the jury followed the district court's curative instructions." *Id.* And the defendants "ha[ve] not come close to establishing that the closing argument was so highly prejudicial as to be incurable by the court's instructions." *Reeves*, 742 F.3d at 506. Therefore, the district court did not abuse its discretion by denying the defendants' motion for mistrial.

### III. CONFLICT OF INTEREST

The third issue, raised by defendant Portocarrero, likewise concerns the two seizures. As noted above, the two groups of three defendants were prosecuted independently. A total of three attorneys were appointed for the six defendants, with each attorney representing one defendant within each group.[4] Portocarrero argues that this defense arrangement violated his Sixth Amendment right to conflict-free counsel because he did not validly waive the conflict and the conflict harmed his defense. Portocarrero says that the conflict prevented his attorney from

[4]Attorney Juan Gonzalez represented Portocarrero in this case and a defendant in the other drug case. Attorney Stewart Abrams represented Vazquez in this case and a defendant in the other drug case. Attorney Martin Feigenbaum represented Valencia in this case and a defendant in the other drug case.

14

attempting to shift blame to the other group of defendants arrested overnight on November 23 to 24 for the cocaine found in the water on November 25. Vazquez adopts this argument, but Valencia does not raise this claim.

A defendant's right to effective assistance of counsel is violated when the defendant's attorney has an actual conflict of interest that impacts the defendant adversely. *United States v. Rodriguez*, 982 F.2d 474, 477 (11th Cir. 1993). A defendant, however, may in some circumstances waive his right to conflict-free counsel. *United States v. Garcia*, 517 F.2d 272, 277 (5th Cir. 1975).[5] *Garcia* provides that, in the case of a potential conflict of interest, the court should conduct an inquiry, akin to the plea colloquy under Federal Rule of Criminal Procedure 11, to determine whether a defendant wishes to waive the conflict. *Id*. at 277–78. A defendant may waive an actual conflict of interest if the waiver is "knowing, intelligent, and voluntary." *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994).

However, a district court's failure to comply with *Garcia* will not require reversal absent an actual conflict of interest. *United States v. Mers*, 701 F.2d 1321, 1326 (11th Cir. 1983) (holding that a district court's violation of *Garcia* and Federal Rule of Criminal Procedure 44(c) was harmless error because there was no

---

[5]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

actual conflict).  "Although joint representation of multiple defendants creates a danger of counsel conflict of interest, the mere fact of joint representation will certainly not show an actual conflict."  *Id*.  (quotation marks omitted).  Rather, an appellant must demonstrate inconsistent interests and show that the attorney chose between courses of action that were "helpful to one client but harmful to the other."  *Id.* at 1328 (quotation marks omitted).  Actual conflicts must have a basis in fact; hypothetical conflicts are not enough.  *Id.*

Here, at the time defense counsel were initially appointed, the government had separately indicted and was prosecuting the seizures of two different go-fast vessels on different days as two independent cases against three different individuals in each case.  No party or counsel has pointed to any place in the record before trial where anyone alleged or mentioned that the cocaine found in the water on November 25 came from the boat seizure overnight on November 23 to 24.  Rather, all of the testimony until Valencia's counsel cross-examined the government's witnesses at trial was that the Coast Guard had seen that cocaine being thrown from the defendants' boat on November 25.

The issue of a potential conflict did not arise until the testimony during the trial.  Thus, we cannot say the district court was required to hold a *Garcia* hearing before the trial began.  And before sentencing the district court did hold a *Garcia* hearing.

16

Even if the *Garcia* hearing was timely enough, Portocarrero and Vazquez argue that it was substantively deficient. Although they expressly waived any potential conflict at the *Garcia* hearing, they allege that the district court did not ask all of the questions it should have. We need not reach that issue because Portocarrero and Vazquez have not shown that their attorneys' dual representation of the two groups presented any actual conflict. Despite the prosecutor's brief reference to a broader conspiracy during closing arguments, the government's case against Portocarrero and Vazquez related solely to their own personal acts of transporting cocaine onboard the vessel on which they were found. They were not being tried jointly with or for the same offenses as their attorneys' other clients on the first vessel. Shifting the blame in Portocarrero's and Vazquez's trial to the first vessel would not have been harmful to Portocarrero and Vazquez, or to the defendants on the first vessel who were being tried separately. In fact, as Portocarrero notes, Valencia's attorney attempted to do just that, despite representing a client in the other group of defendants on the first vessel.

Furthermore, Portocarrero's and Vazquez's counsel did not object when Valencia's counsel cross-examined the government witnesses about the similarity of the cocaine packaging and other features of the first and second boat seizures. In fact, Vazquez's and Portocarrero's defense counsel later did implicitly shift the blame to the other clients on the first vessel during their closing arguments.

17

Vazquez argued that just because the Coast Guard recovered 640 kilograms of cocaine and Vazquez's boat was in the proximity of where the cocaine was recovered did not put that cocaine on Vazquez's boat or mean that it belonged to him.  Portocarrero's counsel argued that nobody was throwing bales off of their boat and there was no evidence that they had cocaine in their boat when the Coast Guard boarded it.  Under the particular circumstances here, neither Portocarrero nor Vazquez have demonstrated that there was an actual conflict of interest, and, thus, no reversal is required.[6]  *See Mers*, 701 F.2d at 1326.

## IV.  SAFETY-VALVE ISSUES

As to the fourth issue, Valencia challenges the constitutionality of the "safety-valve" provisions of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2.  Valencia says that these provisions both unfairly deny benefits to Title 46 defendants, in

---

[6]Portocarrero and Vazquez abandoned any argument that an actual conflict existed relating to any post-trial issues and proceedings.  *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).  In any case, there has been no suggestion that Portocarrero or Vazquez knew the other group of defendants or were interested in cooperating with the government against them.  Additionally, before sentencing, the district court held a *Garcia* hearing; because there is no claim in this appeal that the three defendants' waivers given for post-trial issues were deficient, we do not evaluate that *Garcia* hearing.

Although affirming in this case, we observe that, in an abundance of caution, the more careful course next time would likely be for the magistrate judge to consider appointing separate counsel for all defendants on each boat where (1) the two go-fast boats with cocaine are interdicted so close in time and geography and (2) two indictments, although separate, were filed on the same day.  A conflict could have arisen here if a defendant on one boat decided to cooperate with the government and testify against the defendants on the other boat.  *See Ruffin v. Kemp*, 767 F.2d 748, 749-51 (11th Cir. 1985) (concluding an actual conflict of interest existed where the attorney represented both defendants Ruffin and Brown and actually offered the testimony of Brown against Ruffin in exchange for a lesser penalty for Brown).

violation of equal-protection guarantees, and violate the Fifth Amendment by requiring a defendant to forfeit his right to silence.  Portocarrero adopts these arguments.[7]

When the safety valve applies, the district court may impose a sentence without regard to the statutory minimum sentences that would otherwise limit the court's discretion.  18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2(a).  By its plain terms, the safety valve applies only to convictions under five specified statutes:  21 U.S.C. §§ 841, 844, 846, 960, and 963.  *United States v. Pertuz-Pertuz*, 679 F.3d 1327, 1328 (11th Cir. 2012).  This Court held in *Pertuz-Pertuz* that, because no Title 46 offense appears in the safety valve, defendants convicted under Title 46 are not eligible for safety-valve relief.  *Id.*  Therefore, defendants convicted of offenses under the MDLEA, which are Title 46 offenses, are not eligible for safety-valve relief.  *See id.* at 1328–29.  Thus, as a threshold matter, Valencia and Portocarrero are not eligible for safety-valve relief.

As to their equal-protection claim, Valencia and Portocarrero argue that there is no rational basis to exclude Title 46 defendants from the safety valve when it is available to defendants convicted of drug trafficking within the United States.

---

[7]We ordinarily review *de novo* the constitutionality of a statute, because it presents a question of law, but we review for plain error where a defendant raises his constitutional challenge for the first time on appeal.  *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010).  The parties debate what was raised in the district court, but we need not decide that issue because the defendants' constitutional claims fail in any event.

19

However, this Court recently held that the safety valve's exclusion of Title 46 defendants does not violate the equal-protection guarantee of the Fifth Amendment. *United States v. Castillo*, 899 F.3d 1208 (11th Cir.), *cert. denied*, 2019 WL 113114 (Jan. 7, 2019). Applying rational-basis review, we concluded that Congress had "legitimate reasons to craft strict sentences for violations of the [MDLEA]." *Id.* at 1213. Specifically, "[i]n contrast with domestic drug offenses, international drug trafficking raises pressing concerns about foreign relations and global obligations." *Id.* "Moreover, the inherent difficulties of policing drug trafficking on the vast expanses of international waters suggest that Congress could have rationally concluded that harsh penalties are needed to deter would-be offenders." *Id.* Thus, based on *Castillo*, we reject Valencia's and Portocarrero's equal-protection challenge to the safety valve.

Valencia and Portocarrero also contend that the safety valve violates Fifth Amendment protections against self-incrimination by requiring defendants to provide the government with all information and evidence that they have concerning the offense. 18 U.S.C. § 3553(f)(5); U.S.S.G. § 5C1.2(a)(5). They note that, while they were not eligible to be sentenced below the mandatory minimum, *see Pertuz-Pertuz*, 679 F.3d at 1328, they could have received a two-level reduction in their offense level for meeting the five safety-valve criteria. *See* U.S.S.G. § 2D1.1(b)(17) (2016).

20

Although this Court has not addressed in a published opinion this Fifth Amendment issue as to the safety valve, we have concluded that U.S.S.G. § 3E1.1, the acceptance-of-responsibility provision of the Guidelines, does not violate the Fifth Amendment right against self-incrimination. *United States v. Henry*, 883 F.2d 1010, 1011 (11th Cir. 1989). "Section 3E1.1(a) is not a punishment; rather, the reduction for acceptance of responsibility is a reward for those defendants who express genuine remorse for their criminal conduct." *United States v. Carroll*, 6 F.3d 735, 740 (11th Cir. 1993). Several of our sister circuits have concluded that the same is true for the safety valve in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2(a). *United States v. Cruz*, 156 F.3d 366, 374 (2d Cir. 1998) (conviction under § 841); *United States v. Warren*, 338 F.3d 258, 266-67 (3d Cir. 2003) (conviction under § 846); *United States v. Washman*, 128 F.3d 1305, 1307 (9th Cir. 1997) (conviction under § 841); *United States v. Arrington*, 73 F.3d 144, 149-50 (7th Cir. 1996) (same).

Although the parties briefed the Fifth Amendment issue, we ultimately do not need to address it given our conclusions above that the safety-valve relief is unavailable to all Title 46 MDLEA defendants, such as Valencia and Portocarrero, and that such unavailability does not violate the Equal Protection Clause and is constitutional. Because Valencia and Portocarrero are not eligible for safety-valve relief in the first place, we need not consider whether these defendants otherwise

21

meet the substantive requirements of safety-valve relief or the defendants' constitutional claim based on the Fifth Amendment.

## V.  MINOR-ROLE REDUCTION

Finally, Vazquez argues that at sentencing the district court erred in denying him a minor-role reduction under U.S.S.G. § 3B1.2(b).[8]  Valencia and Portocarrero purport to adopt this argument.[9]  Unlike § 3553(f) and § 5C1.2(a), MDLEA offenders may seek a minor-role reduction under § 3B1.2(b).

As background, Vazquez's, Portocarrero's, and Valencia's presentence investigation reports ("PSI") assigned each of them a base offense level of 38, pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1), because their offenses involved at least 450 kilograms of cocaine, specifically 640 kilograms of cocaine.

Vazquez received a two-point enhancement under § 2D1.1(b)(3)(C) because he was the captain of the vessel and a two-point enhancement for obstruction of justice under § 3C1.1 because he made a series of statements during trial that contradicted the evidence.  As a result, Vazquez received a total offense level of

---

[8]We review a district court's denial of a role reduction for clear error.  *Cruickshank*, 837 F.3d at 1192.

[9]The government maintains that these adoptions were ineffective because minor-role reductions are too individualized to be raised by adoption.  *Cf. United States v. Cooper*, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000) (stating that sufficiency arguments are too individualized to be generally adopted).  Valencia's and Portocarrero's general adoptions are likely inadequate to properly raise the issue on appeal, but we need not address that issue because they lack merit in any event.

42.  Portocarrero and Valencia received no enhancements or reductions, and their total offense level remained at 38.

Each defendant received zero criminal history points, placing each of them in criminal history category I.  As to Vazquez, with a total offense level of 42 and a criminal history category of I, he had an advisory guideline range of 360 months to life imprisonment.  As to Portocarrero and Valencia, with a total offense level of 38 and a criminal history category of I, each had an advisory guideline range of 235 to 293 months' imprisonment.  All three defendants also faced a statutory minimum term of ten years' imprisonment as to their counts.

Each defendant objected to his PSI, arguing that he was entitled to a minor-role reduction.  Specifically, Vazquez contended that there was no evidence that he had any ownership interest in the drugs, any decision-making authority, or any role other than transportation.  Portocarrero argued that he was not the owner or master of the vessel, was a last-minute addition to the trip, and was the youngest and most inexperienced of the three men on the boat.  Valencia asserted that there was no evidence that he had any ownership interest in the cocaine or that he was going to make any money from it.

At the defendants' sentencing hearings, each of them renewed the objection to the lack of a minor-role reduction.  Vazquez reiterated that he did not own the drugs or share in the drugs' profits.  He contended that he did not participate in

planning or organizing the criminal activity or exercise decision-making authority, as he merely provided transportation for the drugs. Portocarrero asserted that he was only 20 years old and was a very small part of the operation.

The district court overruled the defendants' objections to the lack of a minor-role reduction because each defendant failed to establish that he was substantially less culpable than the average participant in the offense.

After overruling the objections, the district court determined that Vazquez's offense level was 42, his criminal history category was I, and his advisory guideline range was 360 months to life imprisonment. After hearing arguments and considering the 18 U.S.C. § 3553(a) factors, the district court sentenced Vazquez to 144 months' imprisonment as to both of his counts, to run concurrently, followed by 5 years' supervised release. The district court noted that Vazquez's punishment should be slightly greater than his codefendants based on his enhancements for being captain of the vessel and obstruction of justice.

The district court determined that Portocarrero's and Valencia's total offense level was 38, their criminal history category was I, and their advisory guideline range was 235 to 293 months' imprisonment. Following arguments from the parties, the court sentenced both Portocarrero and Valencia to 120 months' imprisonment as to both counts, to run concurrently, followed by 5 years' supervised release.

24

As to our review of a district court's denial of a role reduction, we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been made. *Cruickshank*, 837 F.3d at 1192. The court's choice between two permissible views of the evidence will rarely constitute clear error, so long as the basis of the trial court's decision is supported by the record and the court did not misapply a rule of law. *Id.* "The defendant bears the burden of establishing his minor role in the offense by a preponderance of the evidence." *Id.*

Under § 3B1.2(b), a defendant is entitled to a two-level decrease in his offense level if he was a minor participant in the criminal activity. U.S.S.G § 3B1.2(b). A minor participant is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id.* § 3B1.2, cmt. n.5.

When evaluating a defendant's role in the offense, the district court must consider the totality of the circumstances. *Id.* § 3B1.2, cmt. n.3(C). According to § 3B1.2's commentary, the factors courts should consider include "the degree to which the defendant understood the scope and structure of the criminal activity," "the degree to which the defendant participated in planning or organizing the criminal activity," "the degree to which the defendant exercised decision-making authority," "the nature and extent of the defendant's participation in the

25

commission of the criminal activity," and "the degree to which the defendant stood to benefit from the criminal activity."  *Id.*  The court must consider all of these factors to the extent applicable, and it commits "legal error in making a minor role decision based solely on one factor."  *United States v. Presendieu*, 880 F.3d 1228, 1249 (11th Cir. 2018).

In *United States v. De Varon*, we established two principles to "guide the determination of whether a defendant played a minor role in the criminal scheme: (1) 'the defendant's role in the relevant conduct for which [he] has been held accountable at sentencing,' and (2) '[his] role as compared to that of other participants in [his] relevant conduct.'"  *Presendieu*, 880 F.3d at 1249 (quoting *United States v. De Varon*, 175 F.3d 930, 940 (11th Cir. 1999) (en banc)).  "In making the ultimate finding as to role in the offense, the district court should look to each of these principles and measure the discernable facts against them."  *De Varon*, 175 F.3d at 945.

Here, the district court did not clearly err in denying the defendants' requests for a minor-role reduction.  Under *De Varon*'s first principle, the inquiry is whether the defendant "played a relatively minor role in the conduct for which [he] has already been held accountable—not a minor role in any larger criminal conspiracy."  *Id.* at 944.  The record shows that all three defendants knowingly participated in the illegal transportation of a large quantity of cocaine, they were

26

important to that scheme, and they were held responsible only for that conduct. *See* U.S.S.G. § 3B1.2, cmt. n.3(C); *De Varon*, 175 F.3d at 941-43; *see also United States v. Monzo*, 852 F.3d 1343, 1347 (11th Cir. 2017) (considering, as part of the totality of the circumstances, the facts that the defendant "was responsible only for his direct role in the conspiracy, and that he was important to the scheme"). While these facts do not render the defendants ineligible, they support the court's denial of the role reduction.

Further, under *De Varon*'s second principle, the record supports the district court's finding that none of the defendants were "less culpable than most other participants in the criminal activity." U.S.S.G. § 3B1.2, cmt. n.5. Vazquez was the most culpable of the three defendants because he was the master of the vessel and, according to his own testimony, he recruited Valencia and Portocarrero to accompany him. While Valencia and Portocarrero appear to have had less of a role than Vazquez, that fact alone does not make them minor participants. "The fact that a defendant's role may be less than that of other participants engaged in the relevant conduct may not be dispositive of role in the offense, since it is possible that none are minor or minimal participants." *De Varon*, 175 F.3d at 944. And the defendants here failed to show how they were less culpable than "most other participants" in the criminal activity. *See* U.S.S.G. § 3B1.2, cmt. n.5. Based on

27

the totality of the circumstances, the district court did not clearly err in denying the defendants minor-role reductions under § 3B1.2.

Alternatively and as an independent ground for affirmance as to Valencia and Portocarrero, we note that both Valencia and Portocarrero received a substantial sentencing variance from their advisory guideline range of 235 to 293 months' imprisonment to 120 months.  The sentencing court did not just mechanically impose the statutory mandatory minimum but did so only after considering the defendants' request for a variance.  Nonetheless, 120 months is the statutory mandatory minimum.  *See* 21 U.S.C. § 960(b)(1)(B) and 46 U.S.C. § 70506(a).  Thus, any error in the guidelines calculation was harmless as both Valencia and Portocarrero received the statutory mandatory minimum sentence and the district court could not have sentenced them to less.  *See United States v. Westry*, 524 F.3d 1198, 1221-22 (11th Cir. 2008) (finding no error in district court's application of firearm enhancement and then concluding, in any event, any error in guidelines calculation was harmless where application of enhancement did not affect defendants' overall sentences).

## VI.  CONCLUSION

For the reasons stated, we reject the defendants' challenges and affirm their convictions and total sentences.

**AFFIRMED.**

28