[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10061

Non-Argument Calendar

_____

CARLOS MONTEMAYOR,
a.k.a. Fox,
a.k.a. The Director,
a.k.a. Licenciado,

                                        Petitioner-Appellant,

*versus*

UNITED STATES OF AMERICA,

                                        Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-03555-LMM

_____

Before GRANT, ANDERSON and HULL, Circuit Judges.

PER CURIAM:

Carlos Montemayor, a federal prisoner, appeals the district court's denial of his counseled 28 U.S.C. § 2255 motion to vacate, correct, or set aside his conviction and sentence.  In Montemayor's underlying criminal case, Montemayor's retained counsel was Richard Rice, who as an Assistant U.S. Attorney ("AUSA") had participated in the investigation that led to Montemayor's indictment.  Because of that participation, the district court granted the government's motion to disqualify Rice as Montemayor's counsel.  Later, the district court, at Montemayor's request, appointed new counsel, Paul Cognac.  Montemayor entered a guilty plea to six drug-related charges and was sentenced to 411 months of imprisonment.

Montemayor's § 2255 motion alleged, in relevant part, that his appointed counsel Cognac was constitutionally ineffective for failing to preserve for direct appeal the issue of Rice's disqualification.  The district court denied Montemayor's § 2255 motion, concluding he had not established ineffective counsel. After review, we affirm.

## I.  FACTUAL BACKGROUND

### A.    Indictment

In 2004, the Drug Enforcement Agency ("DEA") began a wiretap investigation of a drug trafficking organization led by Edwar Valencia-Gonzalez ("the Valencia investigation").  Through wiretap conversations, agents learned Montemayor was a source of Valencia's cocaine in Atlanta, Georgia.

As a result of the Valencia investigation, in 2009 a federal grand jury indicted Montemayor for: (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(ii), and 18 U.S.C § 2 ("Count One"); (2) conspiracy to import five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B)(ii), and 18 U.S.C. § 2 ("Count Two"); (3) three counts of possession with intent to distribute five or more kilograms of cocaine, in violation of § 841(a) & (b)(1)(A)(ii) ("Counts Four, Five, and Eight"); and (4) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) ("Count Nine").

In 2010, Montemayor was arrested in Mexico, but not extradited to the United States until 2015.  Initially, other attorneys represented Montemayor.  By 2016, Montemayor had retained former AUSA Rice, who had left the U.S. Attorney's Office in 2008.

While representing Montemayor, Rice filed a preliminary motion to suppress all communications and other evidence intercepted by all wiretaps.  The motion to suppress argued, *inter alia*, that (1) the wiretaps failed to establish necessity, (2) the

wiretaps were used as an investigative tool, (3) information from illegal wiretaps was used to obtain the wiretaps, and (4) GPS information from target telephones was also unlawfully obtained.

## B.    Motion to Disqualify Retained Counsel Rice

Pursuant to 18 U.S.C. § 207(a)(1), the government moved to disqualify Rice from representing Montemayor.    Under that statute, a former AUSA is restricted from representing a criminal defendant "in connection with a particular matter . . . in which the [former AUSA] participated personally and substantially" during his time as a government attorney.  18 U.S.C. § 207(a)(1)(B).

The government's disqualification motion contended Rice, while an AUSA in the Narcotics Section, had led a wiretap investigation into a drug trafficking organization headed by Javier Alvarez-Lopez a.k.a. "Gotti" ("the Gotti investigation").  At the time, investigators believed that Gotti's organization was doing business with the Valencia organization to which Montemayor belonged.  As a result, in 2005, agents and AUSAs for both the Gotti and Valencia investigations coordinated and communicated with each other.  During 2005, the AUSAs included in the "necessity" section of their wiretap applications information about both investigations and their connections to each other.  And in wiretap applications for the Gotti investigation, Valencia was identified as a target.  Likewise, Gotti was identified as a target in wiretap applications for the Valencia investigation.

Further, in July and August 2005, Rice, assigned to the Gotti investigation, assisted his counterpart in the Valencia investigation,

then-AUSA John Horn, by working on three pen register applications for call and cell site data for certain phones when Horn was unavailable. Rice certified that he had discussed the applications with an investigating agent in the Valencia investigation. From the pen registers, agents in the Valencia investigation received information about intercepted calls in which Montemayor discussed drug trafficking activities with an intermediary between the Gotti and Valencia drug trafficking organizations.

Ultimately, investigators concluded that, while the two drug trafficking organizations sometimes shared sources of supply in Mexico and communicated with each other, they largely operated independently, and Montemayor's indictment did not cover the Gotti organization. That said, the government represented that it might introduce the recorded calls from the Valencia investigation as evidence against Montemayor at trial.

## C.    Attachments to Disqualification Motion

The government attached to its disqualification motion copies of (1) wiretap applications and affidavits from June through November 2005 associated with the Valencia investigation, (2) wiretap applications and affidavits from May through September 2005 associated with the Gotti investigation, and (3) the pen register applications then-AUSA Rice handled for AUSA Horn in July and August 2005.

As just one example, in a July 15, 2005 wiretap application Horn submitted as part of the Valencia investigation, Gotti was

identified as a target.  The background section of DEA agent Renita Foster's affidavit supporting the application, described the investigations into the Valencia and Gotti organizations.  Agent Foster averred that the Valencia and Gotti organizations were cells of a Mexican drug trafficking organization that each appeared to have their own sources of supply and distribution challenges, and stated:

> However, conversations intercepted on Title III wiretaps to date show that VALENCIA-GONZALEZ communicates with GOTTI regarding the distribution of illegal drugs, and they appear to use some of the same resources, such as warehouses to unload truckloads of drugs and stash houses to store drugs and/or currency.  The wiretaps also show that several Target Subjects, such as JOHN DOE, a.k.a. "ULYSSES," JOHN DOE, a.k.a. "OSCAR," and FNU LNU, a.k.a. "GORDO," have participated in illegal activities for both cells.  Based on the investigation to date, it appears that VALENCIA-GONZALEZ and GOTTI have used at least one common source of supply, although they also use different sources of supply as well.  In addition, I believe that a loose connection exists between VALENCIA-GONZALEZ and GOTTI based on the conversations and overlapping co-conspirators.  Nevertheless, the investigation indicates that VALENCIA-GONZALEZ are [sic] operating independently.  During the next 30

days, agents hope to explore more fully the extent of their relationship.

Similar descriptions of, and references to, the Valencia organization were included in affidavits supporting wiretap applications submitted by Rice for the Gotti investigation.

The "necessity" section of DEA agent Foster's Valencia-investigation affidavit stated the following about the Gotti investigation:

> In addition to the residences identified in this investigation, agents participating in the wiretap investigation of FNU LNU, a.k.a. "GOTTI," and his drug distribution organization have identified four other locations associated with that cell . . . . Agents in Enforcement Group I continue to evaluate the feasibility of performing searches of these locations. However, even if searches are performed, I believe that the evidence obtained would be more useful in prosecuting GOTTI and members of his drug distribution organization. As stated earlier, while there appears to be a relationship between GOTTI and EDWAR VALENCIA-GONZALEZ, they use different sources of supply and distribution networks. Consequently, searches of these locations likely would be of only minimal assistance in the investigation of the VALENCIA-GONZALEZ organization.

Agent Foster's affidavit further stated about the Gotti organization:

> As noted earlier, the two investigations have not conclusively identified the nature of this relationship [between the Valencia and Gotti organizations], but at a minimum it appears that VALENCIA-GONZALEZ communicates with the manager of the other cell, FNU LNU, a.k.a. "GOTTI," and they use some common resources, including warehouses and stash houses. There also appears to be at least one individual, JOHN DOE, a.k.a. "ULYSSES," who has performed services for both cells. Notwithstanding these commonalities, it also appears that VALENCIA-GONZELEZ and GOTTI use different sources of supply to obtain their drugs, and they also rely upon different distribution chains. Under these circumstances, although the wiretap investigation focusing on GOTTI may yield intercepted conversations with VALENCIA-GONZALEZ and, perhaps, other members of VALENCIA-GONZALEZ's organization, I do not believe that the conversations intercepted pursuant to the GOTTI investigation will yield evidence showing VALENCIA-GONZALEZ's sources of supply, distributors, and methods of laundering his drug proceeds. Consequently, I believe that the interception of Target Telephones #1-4 is necessary to achieve the objectives of this investigation.

Of the three pen register applications attached to the government's disqualification motion, one, dated July 27, 2005, was prepared by Horn, but signed and submitted on Horn's behalf by then-AUSA Rice. Another, dated August 4, 2005, seeking information on a telephone used by *Valencia-Gonzalez*, was prepared and signed by then-AUSA Rice, but was not presented to the district court. For both of these applications, Rice signed a declaration under penalty of perjury stating that he had discussed the applications with DEA agents involved in *the Valencia investigation*.

The third pen register application, dated July 28, 2005, was fully prepared, signed, and submitted by then-AUSA Rice, and was authorized by the court. In that July 28 application, Rice stated that based on the Valencia investigation to date, it was believed the user of the target telephone, referred to as Cache, had used and continued to use the target telephone "to facilitate the receipt and distribution of illegal drugs and financial proceeds arising from such unlawful drug trafficking activity." Rice further stated that pursuant to a court-authorized wiretap, agents had "intercepted calls in which CACHE discussed the distribution of illegal drugs and the collection of drug proceeds."

Rice certified that there were reasonable grounds to believe the requested records and information were relevant and material to the DEA's ongoing criminal investigation of *the Valencia drug trafficking organization* and would assist "agents in identifying both co-conspirators in the drug trafficking activity and locations used

by these persons in connection with such activity."   Rice also declared under penalty of perjury that he had discussed the application with DEA agent Renita Foster, the same agent involved in Horn's wiretap applications.

Montemayor opposed the government's disqualification motion, contending the two investigations were not related and did not coordinate prosecution strategy.  Montemayor conceded, however, that then-AUSA Rice had "signed one Pen App on behalf of AUSA Horn and then prepared one Pen App and Order for agents conducting *the Valencia investigation* while AUSA Horn was on vacation," but maintained that these activities did not "constitute personal and substantial involvement" required for disqualification under § 207(a).  (Emphasis added.)  Montemayor also attached copies of the pen register requests Rice handled while Horn was on vacation.

### D.    Parties Waive Evidentiary Hearing and Agree to Submit Declarations

Initially, a magistrate judge determined that Montemayor was entitled to an evidentiary hearing on the government's disqualification motion.  The magistrate judge set the evidentiary hearing for January 2017.  However, the parties then notified the magistrate judge that they agreed additional evidence, necessary for the court to rule on the disqualification motion, could be presented by sworn declarations of Horn and Rice.  The magistrate judge allowed the parties to proceed in this manner and cancelled

the evidentiary hearing. The parties then submitted dueling declarations from Horn and Rice.

In their declarations, Horn and Rice did not agree on the extent to which the Gotti and Valencia investigations overlapped and shared information and the extent to which the two AUSAs conferred and coordinated with each other. We do not include all of Horn's allegations, but provide a brief overview of Horn's description of the extensive overlap and coordination between his Valencia investigation and Rice's Gotti investigation.

### E.    AUSA Horn's Declaration

Consistent with the wiretap applications attached to the government's motion, Horn's declaration stated that between April and July 2005, investigators learned through phone data and wiretaps that Gotti and Valencia frequently communicated with each other, bought and sold drugs from each other, appeared to share some of the same warehouses and stash houses to store drugs and currency, and sometimes purchased drugs from a common source of supply. There also appeared to be one individual, called Ulysses, whom agents initially believed participated in both the Gotti and the Valencia organizations.

According to Horn, this overlap between the Gotti and Valencia investigations caused some tension and required the agents and AUSAs within the two investigative groups to communicate and coordinate with each other on an ongoing basis. The "fruits of this coordination are memorialized in the facts and necessity sections of the agents' wiretap affidavits, including the

July 27, 2005 wiretap affidavit submitted by Mr. Rice in the Gotti investigation." Through the fall of 2005, Gotti and Valencia continued to have interactions with each other that had "to be analyzed and discussed in the ongoing wiretap affidavits' necessity sections" of both investigations and the "wiretap materials submitted in each investigation therefore continued to reference the other investigation."

Horn also said that as an AUSA in the Narcotics Section, he attended mandatory weekly meetings with other AUSAs, including Rice, at which he "openly shared" information about the Valencia investigation. Horn also recalled: (1) speaking and exchanging information with Rice about their respective investigations "in connection with resolving the relationship between Valencia and Gotti"; (2) discussing "the facts of [their] respective investigations . . . on multiple occasions"; (3) "coordinat[ing] with each other in the drafting and submitting of the wiretap pleadings described in the government's Motion to Disqualify"; and (4) at least one meeting with Rice and DEA agents from both the Gotti and Valencia investigations to discuss the tensions between the two investigative groups caused by overlaps in the two investigations. Finally, Horn explained that he would have "review[ed] with [Rice] the language to be included in the necessity sections of the wiretaps to ensure that they were accurate and consistent," before including any information about the Gotti investigation in his wiretap applications for the Valencia investigation.

## F.    Rice's Declaration

Next, we outline what Rice's declaration said about his interactions with Horn and the Valencia investigation. Because Rice's admissions alone show his substantial and personal involvement in the Valencia investigation, we recount them also in detail.

According to Rice, he was generally aware of the Valencia investigation. For a time, the DEA case agent for Rice's Gotti investigation suspected that an individual named Ulysses was involved in both the Gotti organization and the Valencia organization. It later turned out they were separate individuals with the same name.

But while Rice was involved as an AUSA, the two investigations needed to be identified in wiretap applications and affidavits for each investigation, including in the "necessity" and "prior applications" sections of wiretap affidavits. As a result, AUSA Horn and AUSA Rice each prepared and provided to the other text about their respective investigations to be "cut and pasted" into wiretap applications and affidavits. Rice told the DEA case agent for the Gotti investigation to "stay away from" the Valencia investigation, and from that point on, Rice's only discussions about the Valencia investigation were to confirm that the Gotti investigation was steering clear of the Valencia investigation.

Rice recalled one joint meeting of the two groups of investigators, and possibly Horn, "to discuss and ensure there was

no overlapping investigation." However, Rice left the meeting before any substantive discussions of the two investigations began. Rice admitted that he attended most weekly meetings of the DEA agents involved in his Gotti investigation and weekly meetings of AUSAs in the Drug Section. Yet Rice did not recall having any substantive discussions about the Valencia investigation with DEA agents or AUSA Horn.

Rice acknowledged, however, that in late summer 2005, AUSA Horn went on vacation. Prior to leaving, Horn asked Rice to prepare pen register applications for the Valencia investigation, which Rice called "Pens Apps," that would be needed during Horn's absence, and Rice agreed. Rice prepared two pen register applications while Horn was absent. Rice sent the DEA agents involved in the Valencia investigation his template for pen register applications, the DEA agents for the Valencia investigation used the template and drafted a paragraph of "particularized language" stating the factual basis justifying obtaining the phone data, and then the DEA agents submitted the two pen register applications to Rice, who revised them, as needed. Rice could not recall what revisions, if any, he made to the particularized language in these two pen register applications for the Valencia investigation.

For the July 27, 2005 pen register application, Rice certified that he had discussed the application with the investigating agent. Rice said that during his process of preparing a pen register application, his "discussions with the agent who sought the Pen App would be limited to the particularized paragraph providing the

factual basis justifying obtaining the information pursuant to the order." Consistent with this process, Rice did not discuss the Valencia investigation with the DEA agents "other than reviewing the particularized paragraph in the Pen App and Order."

One of the pen register applications Rice prepared and signed while Horn was on vacation was taken by the DEA agents in the Valencia investigation to a magistrate judge for review and signature. The other pen register application was not, "although AUSA Horn prepared a Pen App for the telephone that was the subject of the second Pen App after AUSA Horn returned." Apart from this activity, Rice denied participating in or assisting the Valencia investigation and the criminal cases that resulted from it.

Rice maintained that he had no knowledge of the defendants in the criminal cases resulting from the Valencia investigation until he became Montemayor's defense counsel.

## G.    Montemayor Waives Conflict-Free Counsel

While the disqualification motion was pending, the magistrate judge held a *Garcia* hearing, at which Montemayor waived any potential conflict of interest Rice had due to an overlap between the Gotti and Valencia investigations.[1] By this time,

---

[1] *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975), *abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259 (1984). "*Garcia* provides that, in the case of a potential conflict of interest, the court should conduct an inquiry, akin to a plea colloquy under Federal Rule of Criminal Procedure 11, to determine whether a defendant wishes to waive the conflict." *United States v. Valois*, 915 F.3d 717, 727 (11th Cir. 2019).

another attorney, W. Coleman Sylvan, had joined Rice as retained co-counsel for Montemayor, and Montemayor had obtained independent advice from Sylvan before entering the waiver. Montemayor signed a written waiver, and the magistrate judge found the waiver was knowingly, voluntarily, and intelligently made.

## H.    Magistrate Judge Disqualifies Rice

In a 45-page order, the magistrate judge acknowledged that Montemayor's waiver of conflict-free counsel gave rise to a presumption in favor of counsel of choice. But the magistrate judge found that the government had carried its burden to show retained counsel Rice must be disqualified under § 207(a)(1). The magistrate judge initially credited Horn's recollection over Rice's as to "how he and Mr. Rice satisfied their responsibilities, that is, before including any information about the other AUSA's investigation" in wiretap applications and affidavits and that Horn and Rice "discussed the information to be included . . . in order to draft the applications and affidavits." The magistrate judge found that, although Rice was not the lead AUSA in the Valencia investigation and did not participate in every decision made about that investigation or prosecution, "he did participate sufficiently to trigger application of § 207(a)(1)."

Alternatively, the magistrate judge found that, "even if the court relies on Mr. Rice's statement as to how the information was exchanged for inclusion in the wiretap affidavits, his involvement in the Valencia . . . investigation is just as, if not more, personal and

substantial."   After analyzing Rice's declaration, the magistrate judge concluded it alone was enough to establish that Rice's participation in the Valencia investigation was "substantial and personal," as he had conversations with the investigating agents, reviewed the information available for both investigations, determined what information was required to satisfy the necessity finding, crafted that language, and sent it to Horn for inclusion in the Valencia wiretap affidavits.

The magistrate judge also found that, even if there was no actual conflict of interest, there was an appearance of a conflict of interest because Rice, then representing Montemayor, had "filed a motion to suppress the wiretap authorizations, attacking the necessity for the wiretaps, which relied in part on the language that [Rice] claims he supplied for the very same wiretap affidavits." Thus, the magistrate judge concluded that the court would reach the same conclusion whether Rice's participation was as described by Rice or Horn.

## I.      District Court Affirms Disqualification Order

The district court overruled Montemayor's objections and affirmed the magistrate judge's order disqualifying Rice.   The district court agreed with the magistrate judge's findings about Rice's involvement in the Valencia investigation based on Horn's declaration.

The district court also agreed with the magistrate judge that, "[e]ven if the Court relies on Mr. Rice's statements describing his claimed limited involvement" Rice's admitted participation in the

Valencia investigation—preparing text about the Gotti investigation for Horn to include in his wiretap applications and affidavits and working with agents at Horn's request to prepare and submit pen register and cell site requests for the Valencia investigation—was substantial and personal. The district court further found that Rice's sworn certifications in support of the pen register requests "severely undercut[]" his later claim, in response to the government's motion to disqualify, that he had not received any information about the Valencia organization beyond what was included in the wiretap application and affidavit. The district court concluded that Rice's involvement in the Valencia wiretap applications and pen register requests constituted personal and substantial participation in the Valencia investigation. Thus, the district court found that Rice was properly disqualified under § 207(a)(1), and it affirmed the magistrate judge's order and disqualified Rice from the case.

## J.    Montemayor's Unconditional Guilty Plea

After Rice's disqualification, Montemayor filed a *pro se* motion to "disqualify" his retained co-counsel Sylvan and requested appointed counsel. At a hearing, Montemayor confirmed that he wished to terminate Sylvan as his retained attorney and he did not have funds to retain new counsel. On December 7, 2017, the district court appointed attorney Cognac to represent Montemayor.

Almost a year later, in November 2018, Montemayor entered a non-negotiated, unconditional guilty plea. During the

plea hearing, the district court informed Montemayor (1) of his right to proceed to trial, (2) of the rights he was waiving by pleading guilty, and (3) that after pleading guilty, the only rights he would keep were "the right to have a lawyer represent you, advise you about the case, argue on your behalf at sentencing, and to appeal any legal defect in your plea or your sentence."

The district court confirmed: (1) the government had offered Montemayor a plea bargain, which Montemayor discussed with his attorney Cognac; (2) Montemayor had decided not to accept the government's offer; and (3) Montemayor still wanted to plead guilty. After a colloquy, Montemayor admitted guilt to all six counts against him in the indictment. The district court found Montemayor's plea was knowingly, voluntarily, and intelligently made on the advice of competent counsel.

**K.    Sentencing and Motion to Withdraw Guilty Plea**

At a May 16, 2019 sentencing hearing, the district court imposed terms of 411 months on Counts One, Two, Four, Five and Eight and a term of 240 months on Count Nine, all to run concurrently. The sentencing was held open for resolution of the amount of forfeiture. Approximately two weeks later, new retained counsel, Stephen Reba, entered an appearance as counsel for Montemayor, and Cognac filed a motion to withdraw, which the district court granted.

Montemayor, through retained counsel Reba, moved to withdraw his guilty plea. Montemayor argued that Cognac had given him constitutionally deficient advice to reject the

government's plea deal of approximately 25 years in prison and to enter a non-negotiated plea that Cognac predicted would likely result in a sentence of 10 to 15 years. The district court denied Montemayor's motion to withdraw his guilty plea. On August 7, 2019, the district court entered the final judgment of conviction and sentence.

## L.    Direct Appeal

On direct appeal, Montemayor challenged, among other things, the order disqualifying Rice. *See United States v. Montemayor*, 815 F. App'x 406, 407 (11th Cir. 2020). Montemayor argued the district court committed a fundamental error when it disqualified Rice without holding an evidentiary hearing. *Id.* at 408. This Court concluded that by entering an unconditional guilty plea that was knowing and voluntary, Montemayor had waived his challenge to Rice's disqualification and affirmed Montemayor's convictions. *Id.* at 409-10.[2]

## II.  SECTION 2255 MOTION

In August 2021, Montemayor filed this counseled § 2255 motion. In Ground One, Montemayor claimed that during plea proceedings counsel Cognac was ineffective for failing to raise and preserve properly for direct appeal the issue of Rice's

---

[2] On direct appeal, Montemayor challenged the district court's forfeiture order, but not his 411-month prison sentence. *See Montemayor*, 815 F. App'x at 407.

disqualification.[3]        Montemayor asserted Cognac's ineffective assistance amounted to structural error.  Montemayor pointed out that he had waived any conflict that Rice might have had, giving rise to a presumption in favor of Rice representing him. Montemayor contended the district court had reversibly erred in concluding that the government had overcome the presumption by demonstrating an actual conflict of interest or a serious potential conflict of interest.

A magistrate judge issued a report and recommendation ("R&R"), recommending that Montemayor's § 2255 motion be denied.  As to Montemayor's ineffective counsel claim regarding disqualification of Rice, the R&R concluded Montemayor failed to establish that his counsel Cognac was ineffective under the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984).  On the R&R record, the magistrate judge concluded any basis for challenging on appeal the district court's disqualification of Rice was "patently meritless."  Thus, counsel Cognac's performance was not ineffective and did not prejudice Montemayor in any event.  In this regard, the magistrate judge first pointed out that Montemayor could have preserved the disqualification issue only by either entering a conditional plea or proceeding to trial.  But Montemayor had proffered no evidence that the government

---

[3] Montemayor's § 2255 motion raised two other ineffective-assistance-of-counsel claims that we do not discuss because they fall outside the scope of the certificate of appealability.  *See McKay v. United States*, 657 F.3d 1190, 1195 (11th Cir. 2011).

would have agreed to (and the district court would have accepted) a conditional plea or that Montemayor was prepared to go to trial.

Alternatively, the magistrate judge concluded there was "no reasonable probability" that on direct appeal Montemayor would have prevailed on the disqualification issue. In that regard, the magistrate judge determined that any appeal arguing, as Montemayor did in his § 2255 motion, that the district court erred by weighing the credibility of Horn and Rice without holding an evidentiary hearing would be dismissed under the invited error doctrine because Montemayor had waived the hearing and agreed to proceed by sworn declarations.

The magistrate judge determined that "even without weighing the relative credibility of" the two competing declarations, the rest of the record, including "sworn documents that Rice himself certified and submitted to the Court" plainly showed that the Gotti and Valencia investigations "overlapped and that Rice had personal and substantial involvement and knowledge regarding both (including when he stepped into Horn's role in the Valencia . . . investigation while Horn was on vacation)." In short, the magistrate judge concluded "Montemayor's counsel could not have been ineffective for having 'failed' to preserve that meritless issue for appeal."

Over Montemayor's objections, the district court adopted the R&R and denied Montemayor's § 2255 motion. Among other things, the district court agreed with the magistrate judge that even if counsel Cognac had properly preserved the issue for direct

appeal: (1) "the Eleventh Circuit would not have granted relief because Movant invited the error [of making credibility determinations without a hearing] by agreeing to (and later failing to object to) the use of the declarations"; (2) "evidence beyond the declarations showed that Rice had been involved in an investigation of a drug trafficking organization whose operations overlapped with the organization with which Movant was associated"; and (3) as a result, there was "no reasonable probability that Movant would have prevailed on that issue before the Eleventh Circuit."

## III.  STANDARD OF REVIEW

In considering a district court's denial of a § 2255 motion, we review findings of fact for clear error and questions of law *de novo*. *McKay v. United States*, 657 F.3d 1190, 1195 (11th Cir. 2011). Ineffective-assistance-of-counsel claims present mixed questions of law and fact that we review *de novo*. *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014).

## IV.  DISCUSSION

### A.    Certificate of Appealability

This Court granted a certificate of appealability ("COA") as to "[w]hether the district court erred in determining that Montemayor could not establish prejudice, as to his ineffective assistance claim, based on his counsels' failure to preserve the issue of his predecessor counsel's disqualification."

### B.　　General Principles: Ineffective Assistance

A movant under § 2255 bears the burden to prove he is entitled to relief. *Beeman v. United States*, 871 F.3d 1215, 1222 (11th Cir. 2017). To prevail on an ineffective-assistance-of-counsel claim, a § 2255 movant must show *both* that: (1) his counsel's performance was deficient, in that it fell below an objective standard of reasonableness; and (2) that he suffered prejudice as a result of that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Because both prongs must be met, a court need not determine whether counsel's performance was deficient if the movant failed to show sufficient prejudice. *Id.* at 697. Generally, prejudice occurs when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

When a movant asserts "the unusual claim" that his counsel ultimately failed to preserve for appeal an issue that *was raised and rejected* in the trial court, "the appropriate prejudice inquiry asks whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved." *Davis v. Sec'y for Dep't of Corr.*, 341 F.3d 1310, 1316 (11th Cir. 2003) (involving trial counsel's failure to renew a *Batson* objection at the conclusion of voir dire). In other words, in the "peculiar circumstances" where "the only effect of *trial* counsel's negligence" is on the defendant's appeal, we "must consider how [the movant] would have fared on [direct] appeal had counsel preserved [the neglected] claim for review." *Id.* at 1315, 1316.

We recognize that the government contends that to demonstrate prejudice, Montemayor must show a reasonable probability that, but for counsel Cognac's errors, Montemayor would not have pled guilty and would have insisted on going to trial. That is the prejudice standard generally applicable to ineffective-assistance-of-counsel claims in the guilty plea context. *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Montemayor cannot satisfy this prejudice standard articulated in *Hill*, as he did not aver that he would have insisted on going to trial had Cognac performed differently.

Nonetheless, the gravamen of Montemayor's ineffective-assistance-of-counsel claim is that counsel Cognac's alleged error affected his direct appeal, i.e., Cognac failed to advise him to enter a conditional plea that preserved his right to appeal the disqualification order. Thus, the more appropriate prejudice standard for Montemayor's particular claim here is the one articulated in *Davis*, which is whether there is a reasonable likelihood of a more favorable outcome on direct appeal if the claim had been preserved *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006).

## C.    Montemayor's Ineffective Counsel Claim

Here, in the § 2255 proceedings, the district court did not err in determining that Montemayor could not establish prejudice. Montemayor has not shown a reasonable likelihood that he would have succeeded on the disqualification issue on direct appeal had it been properly preserved. That is because the magistrate judge in

Montemayor's underlying criminal case correctly concluded Rice was prohibited from representing Montemayor under § 207(a), and the district court properly affirmed that order.

A criminal defendant has the Sixth Amendment right to counsel, which includes the right to counsel of his choice. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). While a defendant has "a presumptive right to counsel of choice," the right "is not absolute" because in addition to the defendant's right to an effective advocate, there is "the judiciary's interest in ensuring and maintaining the integrity of our judicial system." *United States v. Campbell*, 491 F.3d 1306, 1310 (11th Cir. 2007) (quotation marks omitted). To overcome the presumption in favor of a defendant's counsel of choice where the defendant has waived potential conflicts, the government must show either an "actual conflict . . . [or] a serious potential for conflict." *Wheat v. United States*, 486 U.S. 153, 164 (1988).

In addition, a former AUSA is restricted from representing a criminal defendant "in connection with a particular matter . . . in which the [former AUSA] participated personally and substantially" during their time as a government attorney. *See* 18 U.S.C. § 207(a)(1)(B).

Here, in Montemayor's underlying criminal case, the magistrate judge found, and the district court affirmed, that Rice, while an AUSA, "personally and substantially" participated in the Valencia investigation even when Rice's declaration was fully credited. There is no clear error in this finding. In particular, Rice

admitted participating in the Valencia investigation by: (1) preparing text about his Gotti investigation that Horn used in his wiretap affidavits and applications, including in the "necessity" sections of the affidavits; and (2) preparing, reviewing, revising, and signing two pen register requests for call and cell site data for target phones. Moreover, in preparing the pen register requests, Rice conceded that he discussed with an investigating DEA agent the "particularized paragraph" containing the factual basis for obtaining the phone data.

The magistrate judge also properly concluded that Rice's representation of Montemayor presented at least the appearance of a conflict of interest, if not an actual conflict of interest, given that Rice had filed on Montemayor's behalf a motion to suppress all wiretap evidence. As the magistrate judge pointed out, Rice's motion to suppress explicitly attacked the necessity for the wiretaps, and Rice admitted preparing some of the language in the "necessity" sections of those wiretap applications. Further, the government contemplated using at trial recorded conversations intercepted pursuant to the Valencia investigation wiretaps, and at least one of those recorded conversations was of Montemayor discussing drug trafficking activities with an intermediary between the Valencia and Gotti organizations. In other words, at the time of the disqualification motion, it was already apparent that Rice, on behalf of Montemayor, was now arguing that the wiretap applications and pen register requests he had helped prepare while an AUSA were unlawful and that evidence obtained from them could not be used against Montemayor.

In short, Rice's own admissions in his declaration about his involvement in the Valencia investigation, along with the undisputed portions of the record, such as the wiretap applications and pen register requests, were sufficient to overcome the presumption in favor of Rice representing Montemayor. Under these circumstances, we readily conclude Montemayor would not have prevailed on this disqualification issue on direct appeal, even if appointed counsel Cognac had advised Montemayor to enter a conditional plea that properly preserved it.

Montemayor argues that he would have prevailed on the disqualification issue on direct appeal because the magistrate judge improperly credited Horn's declaration without holding an evidentiary hearing, thereby shifting the burden from the government to overcome the presumption in favor of Rice's representation. According to Montemayor, the magistrate judge was "unable to make credibility determinations" in ruling on the disqualification motion because the government, which had the burden, declined an evidentiary hearing.

However, Montemayor does not dispute that, after the magistrate judge scheduled an evidentiary hearing on the disqualification motion, he and the government agreed to forgo an evidentiary hearing and asked the magistrate judge instead to consider the parties' declarations in determining whether the government had overcome the presumption in favor of Rice's representation. In other words, Montemayor invited any alleged error by the magistrate judge in making credibility findings and

resolving factual disputes without holding an evidentiary hearing. Accordingly, on direct appeal, this Court could have affirmed the magistrate judge's disqualification of Rice without addressing the merits of Montemayor's arguments based on the invited error doctrine. *See United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009) (stating that this Court is "precluded . . . from reviewing an issue raised on appeal if it has been *waived* through the doctrine of invited error").[4]

In any event, Montemayor's argument ignores the magistrate judge's *alternative* ruling, affirmed by the district court, that Rice's own declaration showed he had personally and substantially participated in the Valencia investigation and presented a serious potential conflict of interest. Therefore, any alleged error—arising from crediting Horn's declaration over Rice's declaration without holding a hearing—would not have prevented this Court from affirming the disqualification order on this independent, alternative ground. *See United States v. Campbell*, 26 F.4th 860, 879 (11th Cir. 2022) (en banc) (explaining that despite

---

[4] Nothing herein should imply that the magistrate judge or the district court was required to hold an evidentiary hearing and could not accept the parties' agreement to proceed by written declarations. The fact that any alleged error was invited removes any need to address that issue. Further, we note that there may have been little for Montemayor to gain from an evidentiary hearing, at which the government could have brought out more detailed information about Rice's involvement in, and knowledge of, the Valencia investigation than was covered by his declaration. For example, the government not only could have cross-examined Rice but also called DEA agents who had worked with Rice on both investigations.

an error in the district court's analysis, this Court may affirm a district court's "ultimately correct" ruling on any ground supported by the law and the record); *United States v. Maher*, 955 F.3d 880, 885 (11th Cir. 2020) ("To obtain reversal of a district court judgment that is based on multiple, independent grounds, [an appellant] must convince us that every stated ground for the judgment against him is incorrect." (quotation marks omitted)).

Montemayor argues that on direct appeal he nonetheless would have prevailed because Rice's disqualification was "structural error" not subject to harmless error analysis. It is true that the *erroneous* deprivation of a defendant's right to counsel of his choice is structural error not subject to review for harmlessness. *Gonzalez-Lopez*, 548 U.S. at 148-50. But in Montemayor's case, the decision to disqualify Rice was correct for the reasons already discussed and there was no erroneous deprivation of Montemayor's Sixth Amendment right to counsel of choice.

Because on direct appeal this Court would have affirmed Rice's disqualification had Cognac preserved the issue for review, Montemayor cannot show prejudice under *Strickland*. *See Davis*, 341 F.3d at 1316.

## V. CONCLUSION

The district court did not err in determining that Montemayor could not establish prejudice as to his ineffective assistance claim based on his counsel's failure to preserve the issue of former retained counsel's disqualification. For this reason, we affirm the district court's denial of Montemayor's § 2255 motion.

23-10061                Opinion of the Court                31

**AFFIRMED.**