[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10576

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JHONATHAN ALFONSO,
a.k.a. Jhonathan Alfonzo,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20306-CMA-1

_____

2                    Opinion of the Court                    22-10576

_____

No. 22-10589

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOSE MIGUEL ROSARIO-ROJAS,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20306-CMA-3

_____

_____

No. 22-10590

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOSE JORGE KOHEN,

                                              Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20306-CMA-2

_____

Before BRANCH, LUCK, Circuit Judges, and BERGER,* District Judge.

BRANCH, Circuit Judge:

The United States Coast Guard seized the Appellants on a vessel bearing no indicia of nationality in what is known as the Dominican Republic's Exclusive Economic Zone ("EEZ"). When the Coast Guard boarded the vessel, no one claimed to be the vessel's master, but the crew asserted that the vessel was of Colombian nationality. Colombia, however, was unable to confirm or deny registry of the vessel, which rendered the vessel a "vessel without nationality"[1] and subject to the jurisdiction of the

---

* The Honorable Wendy Berger, United States District Judge for the Middle District of Florida, sitting by designation.

[1] We note that while the relevant statute uses the term "vessel without nationality," 46 U.S.C. § 70502(c)(1)(A), the parties and many of our cases

United States under § 70502(d)(1)(C) of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501–70508.[2]

Once drugs were discovered on the vessel, the Appellants were arrested, brought to the United States, and prosecuted and convicted of violations of the MDLEA. They argue on appeal that Congress exceeded its authority under the Felonies Clause of the Constitution, and that the MDLEA is unconstitutional both facially and as applied to them for several reasons. In order to address their claims, we must decide, as a matter of first impression, whether the EEZ—the waters extending 200 nautical miles seaward of and adjacent to the territorial sea of a nation—is part of the "high seas," such that Congress has the authority under the Felonies Clause to punish drug-trafficking crimes that occur in the EEZ. Additionally, we address the Appellants' contention that Congress exceeded its authority under the Felonies Clause by defining "a vessel without nationality"—*i.e.*, a stateless vessel—under the MDLEA to include

---

colloquially refer to such vessels as "stateless" vessels. *See, e.g., United States v. Hernandez*, 864 F.3d 1292 (11th Cir. 2017); *United States v. Cruickshank*, 837 F.3d 1182 (11th Cir. 2016); *United States v. Campbell*, 743 F.3d 802 (11th Cir. 2014). Accordingly, to be consistent with the parties' chosen terminology and our caselaw, we use the term "stateless" and a "vessel without nationality" interchangeably.

[2] Although we discuss the MDLEA in greater detail below, in general terms, the MDLEA makes it a crime to engage in drug trafficking (or conspiring to engage in drug trafficking) on board "a vessel subject to the jurisdiction of the United States," which includes stateless vessels. 46 U.S.C. §§ 70502(c)(1)(A), 70503(a)(1), (e)(1), 70506(b).

22-10576               Opinion of the Court                    5

vessels where registry is asserted but cannot be confirmed by the foreign country.[3]

After review and with the benefit of oral argument, we conclude that the EEZ is part of the "high seas" and thus within Congress's authority under the Felonies Clause. We also conclude that the Appellants cannot show that there is any plain error with regard to the MDLEA's definition of a vessel without nationality as including vessels where registry is asserted but cannot be confirmed or denied by the foreign country.[4] Accordingly, we affirm.

---

[3] We note that the Appellants failed to raise this issue in the district court and are raising it for the first time on appeal.

[4] The Appellants also argue that their prosecution under the MDLEA violates the Due Process Clause and exceeds Congress's authority under the Felonies Clause because the drug offenses they were charged with and convicted of bore no nexus to the United States. They acknowledge, however, that this claim is foreclosed by our binding precedent, and they merely seek to preserve it for further review. *See United States v. Cabezas-Montano*, 949 F.3d 567, 587 (11th Cir. 2020) (explaining that "this Court has held that the MDLEA is a valid exercise of Congress's power under the Felonies Clause as applied to drug trafficking crimes without a 'nexus' to the United States"); *United States v. Rendon*, 354 F.3d 1320, 1325 (11th Cir. 2003) ("[T]his circuit and other circuits have not embellished the MDLEA with a nexus requirement."). We therefore do not address this issue further. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (explaining that under the prior panel precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*").

## I.    Background

In 2021, the Coast Guard stopped a go-fast vessel bearing no indicia of nationality approximately 69 nautical miles off the coast of the Dominican Republic in the Dominican Republic's EEZ.  The Appellants here, Jhonathan Alfonso, Jose Jorge Kohen, and Jose Miguel Rosario-Rojas, were aboard the go-fast vessel.  Alfonso made a verbal claim of Columbian nationality for the vessel, but Colombia could not confirm or deny registry of the vessel, which rendered the vessel stateless and subject to the jurisdiction of the United States under the MDLEA, pursuant to 46 U.S.C. § 70502(d)(1)(C).  When authorities searched the vessel, they discovered 12 bales of cocaine.

Alfonso, Kohen, and Rosario-Rojas were arrested, brought to the United States, and indicted on two counts: conspiracy to possess a controlled substance aboard a vessel, in violation of 46 U.S.C. § 70506(b) (Count One), and possession with intent to distribute a controlled substance aboard a vessel, in violation of 46 U.S.C. § 70503(a)(1) (Count Two).  The indictment alleged that this conduct occurred "upon the high seas."

The defendants jointly moved to dismiss the indictment on several grounds.  As pertinent to this appeal, they argued that the MDLEA was unconstitutional as applied to them because they were arrested in the EEZ, which they asserted is not part of the "high seas" as defined by customary international law.  Therefore, because the EEZ was not part of the "high seas," their conduct fell

outside of Congress's authority under the Felonies Clause, and the district court lacked subject matter jurisdiction.

The government opposed the motion, arguing that although a coastal nation has special economic rights in the EEZ adjacent to its territorial waters, the EEZ is still part of the "high seas" within the meaning of the Felonies Clause.

Following an evidentiary hearing, the district court denied the motion to dismiss, concluding that the court had subject matter jurisdiction under the MDLEA. The district court explained that courts have recognized that a nation's territorial waters extend up to twelve nautical miles from the nation's coast and that the waters seaward of the territorial sea are the "high seas." The district court noted that the defendants cited no case where a court had held that the EEZ was not part of the "high seas" and stated that it "[would] not be the first."

Alfonso, Kohen, and Rosario-Rojas subsequently each pleaded guilty to Count One—conspiracy to possess with intent to distribute five kilograms or more of cocaine while on board a vessel subject to the jurisdiction of the United States. In exchange for their pleas, the government agreed to dismiss Count Two. Notably, at no point in the proceedings below did the defendants argue that Congress exceeded its authority under the Felonies Clause by defining a "vessel without nationality" under § 70502(d)(1)(C) of the MDLEA to include vessels where registry is asserted but cannot be confirmed or denied by the foreign country.

Alfonso, Kohen, and Rosario-Rojas now appeal their convictions.[5]

## II.    Standards of Review

Generally, the district court's denial of a motion to dismiss an indictment is reviewed only for an abuse of discretion. *United States v. McPhee*, 336 F.3d 1269, 1271 (11th Cir. 2003). But when, as here, the motion to dismiss is based on subject matter jurisdictional grounds our review is *de novo*. *Id*.; *see also United States v. Cabezas-Montano*, 949 F.3d 567, 588 & n.13 (11th Cir. 2020) (explaining that we review *de novo* issues of subject matter jurisdiction, including whether "the statutory requirements of MDLEA subject matter jurisdiction are met"). Likewise, "[w]e review *de novo* a district court's interpretation of a statute and whether a statute is constitutional." *Cabezas-Montano*, 949 F.3d at 586 n.10. "The government bears the burden of establishing that the statutory requirements of MDLEA subject-matter jurisdiction are met." *Id*. at 588.

Finally, when a defendant raises a constitutional challenge for the first time on appeal, we review only for plain error. *See United States v. Valois*, 915 F.3d 717, 729 n.7 (11th Cir. 2019) ("We ordinarily review *de novo* the constitutionality of a statute, because it presents a question of law, but we review for plain error where a

---

[5] Despite pleading guilty, Alfonso, Kohen, and Rosario-Rojas are permitted to "question the Government's power to constitutionally prosecute" their offenses. *Class v. United States*, 583 U.S. 174, 181–82 (2018) (quotations omitted).

defendant raises his constitutional challenge for the first time on appeal.").

### III.    Discussion

A. *Whether the district court erred in concluding that it had subject matter jurisdiction because the EEZ is part of the "high seas"*

We start with a discussion of the MDLEA and several relevant maritime law concepts to provide context for the parties' arguments and the discussion that follows.

The MDLEA makes it a crime to "knowingly or intentionally . . . possess with intent to manufacture or distribute, a controlled substance" on board "a [covered] vessel subject to the jurisdiction of the United States," 46 U.S.C. § 70503(a)(1) and (e)(1), and to conspire to do the same, *id.* § 70506(b).  The statute defines a "vessel subject to the jurisdiction of the United States" as including "a vessel without nationality." *Id.* § 70502(c)(1)(A).  And a "vessel without nationality" is further defined to include "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." *Id.* § 70502(d)(1)(C).  Notably, the MDLEA "applies even though the act is committed outside the territorial jurisdiction of the United States." *Id.* § 70503(b).

As mentioned previously, Article I, Section 8, Clause 10 of the Constitution bestows on Congress "three distinct grants of power:" (1) "the power to define and punish piracies," (the Piracies

Clause); (2) "the power to define and punish felonies committed on the high [S]eas," (the Felonies Clause); and (3) "the power to define and punish offenses against the law of nations" (the Offences Clause). *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1248 (11th Cir. 2012). We repeatedly have upheld the MDLEA as a valid exercise of Congress's power "to define and punish . . . Felonies on the high Seas." *United States v. Estupinan*, 453 F.3d 1336, 1338–39 (11th Cir. 2006) (rejecting claim that Congress "exceeded its authority under the Piracies and Felonies Clause in enacting the MDLEA"); *Cabezas-Montano*, 949 F.3d at 587 (holding that "the MDLEA is a valid exercise of Congress's power under the Felonies Clause as applied to drug trafficking crimes without a 'nexus' to the United States"). Congress, however, lacks the power to proscribe drug trafficking in the territorial waters of another State. *United States v. Davila-Mendoza*, 972 F.3d 1264, 1269, 1274–77 (11th Cir. 2020); *see also Bellaizac-Hurtado*, 700 F.3d at 1258. In this case, the Appellants do not question Congress's authority under the Felonies Clause to regulate conduct that occurs on the high seas. Instead, they argue that the EEZ—the location of their seized vessel—is not part of the "high seas" within the meaning of the Felonies Clause.

The EEZ sits just beyond a nation's territorial waters but within 200 miles of the coastal baseline. *See United States v. Rioseco*, 845 F.2d 299, 300 n.1 (11th Cir. 1988) (describing the EEZ as "a 200 nautical mile zone extending from a coastal State's baseline in which the coastal State has priority of access to living resources and exclusive right of access to non-living resources"); United Nations

22-10576          Opinion of the Court          11

Convention on the Law of the Seas ("UNCLOS"), pt. V, art. 55, 57, Dec. 10, 1982, 21 I.L.M. 1261, 1280 (defining the EEZ as "an area beyond and adjacent to the territorial sea" that "shall not extend beyond 200 nautical miles from the baselines from which the breadth of the territorial sea is measured," "under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this Convention"[6]); 33 C.F.R. § 2.30(b) (defining the EEZ as "the waters seaward of and adjacent to the territorial sea, not extending beyond 200 nautical miles from the territorial sea baseline, as recognized by the United States").  The question we must answer here is whether the EEZ is part of the "high seas" for purposes of the Felonies Clause.  Thus, this appeal turns on the meaning of the term "high seas" within the Felonies Clause.

The scope of Congress's authority under the Felonies Clause (*i.e.*, whether Congress can define and punish conduct that occurs in an EEZ) is informed by the meaning of "high seas" when the Framers ratified and adopted the Constitution.  *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 25–26 (2022) (explaining that when assessing the scope of constitutional rights we must consult the historical understanding of the right); *McDonald v. City of Chicago*, 561 U.S. 742, 828 (2010) (Thomas, J., concurring) ("When

---

[6] Although the United States was not a party to UNCLOS, it "generally recognizes the Convention as customary international law apart from the deep sea-bed mining provisions." *United States v. McPhee*, 336 F.3d 1269, 1273 n.6 (11th Cir. 2003) (alteration adopted) (quotations omitted).

interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted."); *Boumediene v. Bush*, 553 U.S. 723, 843 (2008) (Scalia, J., dissenting) ("The proper course of constitutional interpretation is to give the text the meaning it was understood to have at the time of its adoption by the people."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 403–10 (2012) (explaining that the original meaning governs interpretation of the Constitution).

Accordingly, to understand the meaning of the term "high seas" at the Founding, we turn to the history of maritime sovereignty. Throughout much of the sixteenth and seventeenth centuries, the sea was largely viewed as common property subject to unilateral appropriation by any nation—rendering the boundaries within the sea fluid at best. *See* Thomas W. Fulton, *The Sovereignty of the Sea* 357, 538–55 (1911), available at https://perma.cc/HE4Y-WMA3; Bernard G. Heinzen, *The Three-Mile Limit: Preserving the Freedom of the Seas*, 11 Stan. L. Rev. 598, 598 (1959). As a result, nations made wide and conflicting claims of sovereignty over the seas.[7] Fulton*, supra*, at 538–55; Heinzen, *supra,* at 600–01.

However, in the eighteenth century, the concept that a nation could exercise sovereignty over waters within the range of

---

[7] For instance, some nations contended that territorial jurisdiction extended 100 miles from their coasts, while others claimed only a six-mile boundary from the coast. *See* Fulton, *supra*, at 360, 569.

a nation's artillery on its shores—often referred to as the cannon shot rule—took root and became more widespread.[8] Fulton, *supra*, at 556–58, 576–77; Heinzen, *supra,* at 602–05.   Following the ratification and adoption of the Constitution, several of our nation's judicial decisions embraced the cannon shot rule as establishing the United States's territorial waters.  *See, e.g.*, *Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 234 (1804) ("The authority of a nation within its own territory is absolute and exclusive. The seizure of a vessel within the range of its cannon by a foreign force is an invasion of that territory, and is a hostile act which it is its duty to repel."); *The Ann*, 1 Fed. Cas. 926, 926 (C.C.D. Mass. 1812) (No. 397) (Story, Circuit Justice) ("All the writers upon public law agree that every nation has exclusive jurisdiction to the distance of a cannon shot, or marine league, over the waters adjacent to its shores, and this doctrine has been recognized by the supreme court of the United States." (internal citation omitted)); *see also United States v. Alarcon Sanchez*, 972 F.3d 156, 170 (2d Cir. 2020) ("At the founding, the United States's territorial waters extended 'roughly three miles.'" (quoting *In re Air Crash Off Long Island*, 209 F.3d 200, 205 (2d Cir. 2000)); Thomas Jefferson, Letter to Certain Foreign Ministers in the United States (Nov. 8, 1793) (stating in a letter that in considering what distance from our shores "the territorial protection of the United States shall be exercised," President

---

[8] There was debate about the range of such a boundary, but sources generally agree it ranged from one to at most three miles from shore.  Fulton, *supra*, at 565, 576; Heinzen, *supra,* at 602–05.

14                    Opinion of the Court                    22-10576

Washington had "provisionally" ordered his officers "to consider . . . for the present . . . the distance of one sea-league or three geographical miles from the sea shores," which Jefferson equated with "the utmost range of a cannon ball").[9]

Although the exact boundary of a cannon shot—be it one or three miles—may have been up for debate, it was generally understood that the "high seas" were the waters beyond a nation's territorial sea and that the "high seas" were not subject to the sovereignty of any nation. *See, e.g.*, 1 William Blackstone, Blackstone's Commentaries with Notes of Reference to the Constitution & Laws of the Federal Government of the United States; and of the Commonwealth of Virginia *111–12 (1803) (referring to "[t]he main or high seas" as "begin[ning] at the low-water mark"); William Rawle, A View of the Constitution of the United States 107 (2d ed. 1829) ("After the territorial boundaries of a nation are left, the sea becomes the common property of all nations, and the rights and privileges relative thereto being regulated by the law of nations and treaties, properly belong to the national jurisdiction."); *id.* ("By the high seas we are to understand not only the ocean out of sight of land, but waters on the sea coast beyond the boundaries of low water mark, although in a roadstead or bay, within the jurisdiction or limits of one of the states or of a

---

[9] We note that the concept of territorial sea under international law has continued to evolve with time. In 1988, President Ronald Regan officially extended the United States' territorial sea from three to twelve nautical miles by means of a presidential proclamation to conform with current international law. *See* Proclamation No. 5928, 54 Fed. Reg. 777 (Dec. 27, 1988).

foreign government."); 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1159 (1833) ("What is the meaning of 'high seas' within the intent of [the Felonies Clause] does not seem to admit of any serious doubt. The phrase embraces not only the waters of the ocean, which are out of sight of land, but the waters on the sea coast below low water mark, whether within the territorial boundaries of a foreign nation, or of a domestic state."); *see also United States v. Rodgers*, 150 U.S. 249, 259 (1893) ("[A] large body of navigable water[,] . . . open and unconfined, and not under the exclusive control of any one nation or people, . . . must fall under the definition of 'high seas' . . . ."). In short, when the Framers adopted Article I of the Constitution, there were two divisions of the sea—territorial waters of nations and the "high seas," the latter of which fell outside of national sovereignty. Special carveout zones, such as the EEZ, did not exist.

The first official international recognition of the EEZ appears in the 1982 UNCLOS treaty, which defines the EEZ as the area of water just beyond a nation's territorial waters but within 200 miles of the coastal baseline. *See* UNCLOS, *supra*, arts. 55, 57; 33 C.F.R. § 2.30(b) (providing that "exclusive economic zone means the waters seaward of and adjacent to the territorial sea, not extending beyond 200 nautical miles from the territorial sea baseline, as recognized by the United States"). As the United States has made clear, the EEZ is a unique creation with limited features: "[t]he EEZ is a maritime area in which the coastal state may exercise certain limited powers as recognized under international law. The EEZ is not the same as the concept of the territorial sea,

16                    Opinion of the Court                    22-10576

and [it] is beyond the territorial jurisdiction of any coastal state." White House Office of the Press Secretary, Fact Sheet on Ocean Policy Accompanying Proclamation on an Exclusive Economic Zone, 22 I.L.M. 461, 462 (March 10, 1983). Rather, within each coastal nation's respective EEZ, coastal nations have only limited sovereign economic-related rights to explore, exploit, conserve, and manage the natural resources, both living and non-living. UNCLOS, *supra*, art. 56; *see also R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 965 n.3 (4th Cir. 1999) ("Within [the EEZ], a nation may exercise exclusive control over economic matters involving fishing, the seabed, and the subsoil, but not over navigation.").

Nothing about the modern EEZ as defined by customary international law disturbs in any way the Founding era concept of the term "high seas" that informed the original meaning of the Felonies Clause. Accordingly, we conclude, as a matter of first impression, that the EEZ is part of the "high seas" for purposes of the Felonies Clause in Article I of the Constitution.[10]

---

[10] To be clear, we hold only that customary international law has no bearing on the meaning of the "high seas" as understood by the Framers at the time they adopted the Felonies Clause. We recognize that there are potentially other instances when international law considerations may inform MDLEA-based challenges. *See United States v. Marino-Garcia*, 679 F.2d 1373, 1380 (11th Cir. 1982) (noting that international law is relevant to statutory construction because "the Supreme Court has long admonished that an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains" (quotations omitted)).

The Appellants resist this conclusion and maintain that the scope of Congress's power under the Felonies Clause is confined to the limits proscribed by customary international law—by which they mean current contemporary concepts of international law—which provides that the EEZ is not part of the "high seas." Therefore, they argue, the enforcement of the MDLEA in the EEZ exceeds Congress's power under the Felonies Clause.

In support of their argument that Congress's authority is limited by customary international law, the Appellants mainly rely on our decision in *Bellaizac-Hurtado*, which addressed Congress's authority under the Offences Clause (not the Felonies Clause) to proscribe drug trafficking committed in the territorial waters of another country. 700 F.3d at 1248–49. Their reliance is misplaced. In *Bellaizac–Hurtado*, we concluded that the MDLEA was unconstitutional under the Offences Clause as applied to the defendants who had committed their drug trafficking offense within the territorial waters of Panama. *Id.* at 1247, 1258. After examining Supreme Court precedent and the text, history, and structure of the Offences Clause, we concluded that "[t]he power granted to Congress in the Offences Clause is limited by customary international law." *Id.* at 1249. In relevant part, we reasoned that the meaning of the phrase "define . . . offenses against the laws of nations" during the Founding period "would not have been understood to grant Congress the power to create or declare offenses against the law of nations, but instead to codify and explain offenses that had already been understood as offenses against the law of nations." *Id.* at 1249–50. Thus, we held that "we look to

18                    Opinion of the Court                    22-10576

international law to ascertain the scope of the power granted to Congress under the Offences Clause."[11]  *Id.* at 1251.  We then agreed with our sister circuits that the phrase "'law of nations' in contemporary terms, means customary international law."  *Id.* Finally, we held that drug trafficking, like most instances of private criminal activity, is not a violation of customary international law.[12] *Id.* at 1249–58.

---

[11] The Appellants assert that *Bellaizac-Hurtado* established that the scope of Congress's power under the Piracies Clause is also limited by international law, and, therefore applying the principle of *noscitur a sociis*—the statutory canon of construction that associated words bear on one another's meaning— it follows that the Felonies Clause is similarly constrained.  The Appellants are mistaken.  In *Bellaizac-Hurtado*, we expressly stated that neither the Piracies Clause nor the Felonies Clause was implicated, and that only the Offences Clause was in question.  700 F.3d at 1248–49.  Furthermore, we emphasized that "the power to 'define' in Article I, Section 8, Clause 10, is limited by the three specific subjects of the Clause," *id.* at 1249, meaning that each of the three grants of power enumerated in Article I, Section 8, Clause 10, has its own unique and distinct meaning making application of the *noscitur a sociis* canon here a poor fit.

[12] In reaching this conclusion, we explained that whether the Offences Clause "limits the power of Congress to define and punish only those violations of customary international law that were established at the Founding or whether the power granted under the Clause expands and contracts with changes in customary international law" remained an open question.  *Bellaizac-Hurtado*, 700 F.3d at 1253.  But we declined to address this issue because, "under either approach, the result [was] the same" because "[d]rug trafficking was not a violation of customary international law at the time of the Founding, and drug trafficking is not a violation of [present-day] customary international law . . . ." *Id.* at 1253–54.

22-10576               Opinion of the Court                    19

The Appellants seek to extend *Bellaizac-Hurtado*'s reasoning to the Felonies Clause and argue that, as with the Offences Clause, Congress's authority under the Felonies Clause to define and punish felonies committed on the "high seas" is limited by customary international law. And the Appellants contend that, under customary international law, the EEZ is not part of the "high seas" based on UNCLOS's definition of EEZ and its related section pertaining to "high seas,"[13] as well as the definition of an EEZ in the Code of Federal Regulations.[14]

We decline their invitation. Our holding in *Bellaizac-Hurtado* that the Offences Clause—"Congress shall have Power . .

---

[13] A separate part of UNCLOS covering general provisions for the "high seas" carves out EEZs from its scope:

> [t]he provisions of this Part apply to all parts of the sea that are not included in the exclusive economic zone, in the territorial sea or in the internal waters of a State, or in the archipelagic waters of an archipelagic State. This article does not entail any abridgement of the freedoms enjoyed by all States in the exclusive economic zone in accordance with article 58.

UNCLOS, *supra*, pt. VII, § 1, art. 86.

[14] As noted previously, UNCLOS defines the EEZ as "an area beyond and adjacent to the territorial sea" that "shall not extend beyond 200 nautical miles from the baselines from which the breadth of the territorial sea is measured," "under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this Convention." *Id*. pt. V, arts. 55, 57. Similarly, the Code of Federal Regulations defines the EEZ as "the waters seaward of and adjacent to the territorial sea, not extending beyond 200 nautical miles from the territorial sea baseline, as recognized by the United States." *33* C.F.R. § 2.30(b).

. [t]o define and punish . . . Offences against the Law of Nations,"[15]—was limited by customary international law was driven by the presence of the eighteenth-century phrase the "law of nations" that follows the word "define." 700 F.3d at 1250–52. Here, however, Congress's authority under the Felonies Clause— "[t]o define and punish . . . Felonies committed on the high Seas"— is not narrowed by the limiting language "against the Law of Nations" that appears in the Offences Clause. *See* U.S. Const., art. I, § 8, cl. 10. Thus, *Bellaizac-Hurtado*'s discussion of the meaning of the word "define" as it relates to the Offences Clause does not support the Appellants' position that Congress's authority under the Felonies Clause is similarly limited to customary international law—much less customary international law as it is defined today. Rather, as we explained above, when the Framers adopted the Felonies Clause, there were two concepts of the sea—territorial waters and the "high seas." Special carveout zones, such as the EEZ, did not exist. Rather, these special carveout zones fell within what has been historically recognized as the "high seas." And the subsequent modern recognition of the EEZ in the twentieth century has no bearing on the original meaning of "high seas" in the Felonies Clause.[16]

---

[15] U.S. Const., art. I, § 8, cl. 10.

[16] Despite the above, the Appellants argue that 33 C.F.R. § 2.32(d) confirms that the EEZ is not part of the "high seas." Section 2.32 of the Code of Federal Regulations is entitled "High Seas" and provides in full as follows:

(a) For purposes of special maritime and territorial jurisdiction of the United States as defined in 18 U.S.C. 7, high seas means all

waters seaward of the territorial sea baseline.

(b) For the purposes of section 2 of the Act of February 19, 1895, as amended (33 U.S.C. 151) and the Inland Navigational Rules Act of 1980 (33 U.S.C. Chapter 34), high seas means the waters seaward of any lines established under these statutes, including the lines described in part 80 of this chapter and 46 CFR part 7.

(c) For the purposes of 14 U.S.C. 522, 14 U.S.C. 545, 33 U.S.C. 409, and 33 U.S.C. 1471 et seq., *high seas includes the exclusive economic zones of the United States and other nations, as well as those waters that are seaward of territorial seas of the United States and other nations.*

(d) Under customary international law as reflected in the 1982 United Nations Convention on the Law of the Sea and without prejudice to high seas freedoms that may be exercised within exclusive economic zones pursuant to article 58 of the United Nations Convention on the Law of the Sea, and unless the context clearly requires otherwise (e.g., The International Convention Relating to Intervention on the High Seas in Cases of Oil Pollution Casualties, 1969, including annexes thereto), *high seas means all waters that are not the exclusive economic zone (as defined in § 2.30), territorial sea (as defined in § 2.22), or internal waters of the United States or any other nation.*

33 C.F.R. § 2.32 (emphasis added). According to the Appellants, § 2.32(d) leaves no question that EEZs are not part of the "high seas" as that term is defined under customary international law.

Their reliance on subsection (d) is misplaced. As discussed above, we do not look to present day customary international law to determine the meaning of "high seas" in the Felonies Clause. Furthermore, § 2.32(c)—not subsection (d)—defines "high seas" for purposes of the interdiction of vessels on the "high seas" by the Coast Guard under 14 U.S.C. § 522—and, as set forth above,

Our conclusion that the Felonies Clause is not limited by customary international law is reinforced by our post-*Bellaizac-Hurtado* decision in *United States v. Campbell*, 743 F.3d 802 (11th Cir. 2014).    In *Campbell*, the defendant challenged his MDLEA convictions, arguing that Congress exceeded its authority under the Felonies Clause because his conduct lacked any nexus to the United States and because drug trafficking did not fall within the meaning of a felony at the time of the Founding. *Id.* at 809–10. We disagreed and upheld his convictions.    As relevant here, we explained that "[w]e have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause," citing *Bellaizac-Hurtado*. *Id.* We also noted that, in *Estupinan*, 453 F.3d at 1338, "we rejected an argument that Congress exceeded its authority under the Piracies and Felonies Clause in enacting the [MDLEA]," *Campbell*, 743 F.3d at 810 (quotations omitted).    Although the Felonies Clause arguments in *Campbell* were different from those raised here, *Campbell* is still persuasive.  If the Felonies Clause were also limited by customary international law, as the Appellants argue, then Campbell's MDLEA convictions could not be supported under the Felonies Clause because the Court would have run into the same problem it did with the Offences Clause in *Bellaizac-Hurtado*— customary international law does not limit drug trafficking.  By continuing to uphold extraterritorial drug-trafficking convictions

---

subsection (c) expressly includes the EEZ as part of the "high seas" definition. *See* 33 C.F.R. § 2.32(c).

under the MDLEA as a valid exercise of Congress's authority under the Felonies Clause post-*Bellaizac-Hurtado*, we implicitly concluded that international law does not limit the Felonies Clause.

Finally, we note that we are not the only circuit to conclude that the EEZ is part of the "high seas." In *United States v. Beyle*, 782 F.3d 159, 166 (4th Cir. 2015), the Fourth Circuit rejected a nearly identical argument to the one raised here and held that the "high seas" encompasses the EEZ. Specifically, Beyle's vessel was "thirty to forty nautical miles from the Somali coast" in the EEZ when the crimes occurred, and he insisted that "UNCLOS treat[ed] the EEZ as a distinct quasi-territorial entity and that the high seas do not begin until two hundred nautical miles from land," such that the United States did not have subject matter jurisdiction. *Id*. at 162, 167. The Fourth Circuit rejected this argument, reasoning that the "high seas" encompasses all waters outside the territorial sea, including the EEZ. *Id*. at 166. In rejecting Beyle's reliance on UNCLOS, the Fourth Circuit reasoned as follows:

> While it is true that the part of UNCLOS that is titled "High Seas" concerns the waters extending beyond the borders of the EEZ, *see* UNCLOS, *supra*, art. 86, almost all of the treaty's high-seas provisions apply with equal force inside the EEZ as they do outside it, *see id*. art. 58(1)-(2). The EEZ bordering a particular nation's territorial sea is merely a part of the high seas where that nation has special economic rights and jurisdiction. UNCLOS grants coastal nations certain rights to natural resources within the EEZ, as well as jurisdiction over marine scientific research and

> protection and preservation of the marine environment. *Id.* art. 56(1)(a), (b); *see also Titanic*, 171 F.3d at 965 n. 3 (noting that the EEZ grants "exclusive control over [certain] economic matters . . . , but not over navigation").
>
> Any allocation of economic rights, however, is a far cry from conferring on a nation the exclusive authority endemic to sovereignty to define and punish criminal violations. In effect, Beyle would have us use UNCLOS's grant of certain specific enumerated rights as a wedge to dramatically expand Somalia's plenary control past the twelve-nautical-mile maximum. But Beyle points to no court that has declared that a nation's full sovereign rights extend two hundred nautical miles from the coast. We decline to credit such a sweeping interpretation.

*Id.* at 166–67. Thus, the Fourth Circuit's decision further reinforces our conclusion.

Moreover, although the Fourth Circuit is the only other circuit to have squarely addressed the same question we face here, we note that several of our sister circuits have also indicated, albeit in passing, that the EEZ is part of the "high seas." *See, e.g.*, *United States v. Aybar-Ulloa*, 987 F.3d 1, 3 n.1 (1st Cir. 2021) (en banc) (explaining that although the defendant's vessel appeared to be within the EEZ, "[b]ecause the right of freedom of navigation on the high seas applies in the EEZ, we proceed with reference to the rules of interdiction applicable on the high seas"); *Alarcon Sanchez*, 972 F.3d at 170 (concluding that "high seas" means the waters

"beyond a nation's territorial waters," and therefore a vessel 132 nautical miles off the coast of Costa Rica "is comfortably beyond Costa Rica's territorial waters as the framers would have understood the term and under current international law"); *United States v. Matos-Luchi*, 627 F.3d 1, 2 & n.1 (1st Cir. 2010) (upholding MDLEA conviction for individuals seized on a vessel in the Dominican Republic's EEZ and explaining that the area "about thirty to thirty-five miles" from the Dominican Republic's coast "is outside Dominican territorial waters and [is] considered the 'high seas' for purposes of the Coast Guard's enforcement jurisdiction, although within the Dominican Republic's exclusive economic zone" (internal citations omitted)). In fact, the Appellants have not pointed to any judicial decision holding that the EEZ is not part of the "high seas."

Because the "high seas" includes EEZs, enforcement of the MDLEA in EEZs is proper, and the district court properly denied the Appellants' motion to dismiss the indictment.

### B. Appellants' constitutional challenge to 46 U.S.C. § 70502(d)(1)(C)'s definition of a vessel without nationality

Next, the Appellants challenge the constitutionality of the MDLEA's definition of "a vessel without nationality" in 46 U.S.C. § 70502(d)(1)(C). To provide necessary context for the Appellants' arguments, however, we begin by summarizing some general international law principles and the relevant definition of a vessel without nationality in the MDLEA.

Under international law, as defined by multilateral international treaties entered into by the United States, vessels on the "high seas" are typically subject to the criminal jurisdiction only of their nation of registry. *United States v. Marino-Garcia*, 679 F.2d 1373, 1380 (11th Cir. 1982) ("[I]nternational law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas."); *see also* Law of the Sea: Convention on the High Seas art. 6, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82 ("Ships shall sail under the flag of one State only and, save in exceptional cases expressly provided for in international treaties or in these articles, shall be subject to its exclusive jurisdiction on the high seas."). However, "[s]tateless vessels, such as the one [the Appellants] boarded, are 'international pariahs' that have 'no internationally recognized right to navigate freely on the high seas.'" *Campbell*, 743 F.3d at 810 (quoting *Marino-Garcia*, 679 F.2d at 1382). And "we have long upheld the authority of Congress to 'extend[] the criminal jurisdiction of this country to any stateless vessel in international waters engaged in the distribution of controlled substances.'" *Id.* (alteration in original) (quoting *Marino-Garcia*, 679 F.2d at 1383).

The MDLEA defines a "vessel subject to the jurisdiction of the United States" as including "a vessel without nationality"—*i.e.*, a stateless vessel. 46 U.S.C. § 70502(c)(1)(A). And a "vessel without nationality" is further defined to include "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and

unequivocally assert that the vessel is of its nationality." *Id.* § 70502(d)(1)(C).

No one disputes that the Appellants' vessel met the criteria of § 70502(d)(1)(C)— a claim of Columbian registry was made, but Columbia could not confirm or deny registry of the vessel, which rendered the vessel stateless under this statutory provision. Rather, Appellants argue for the first time on appeal that § 70502(d)(1)(C) of the MDLEA is unconstitutional both facially and as applied. They maintain that under customary international law, a verbal claim of nationality is prima facie proof of the vessel's nationality and that § 70502(d)(1)(C) improperly displaces that proof without any affirmative evidence to the contrary.[17]

To begin, we must determine the appropriate standard of review. "We ordinarily review *de novo* the constitutionality of a statute, because it presents a question of law, but we review for plain error where a defendant raises his constitutional challenge for the first time on appeal." *Valois*, 915 F.3d at 729 n.7. The Appellants did not raise a constitutional challenge to

---

[17] We reject the government's argument that the Appellants' claim is squarely foreclosed by our decisions in *Campbell*, 743 F.3d at 802, and *Hernandez*, 864 F.3d at 1298–1303. Although both cases involved a stateless vessel under § 70502(d)(1)(C), neither case involved a challenge to the constitutionality of the definition of a stateless vessel in § 70502(d)(1)(C). *See Campbell*, 743 F.3d at 804, 810–11; *Hernandez*, 864 F.3d at 1298–1303. Accordingly, they do not foreclose the Appellants' challenge here.

§ 70502(d)(1)(C) below, so we review only for plain error.[18] "To establish plain error, a defendant must show there is (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005). "If all three conditions are met, we may exercise our discretion to recognize a forfeited error, but only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (quotations omitted). When neither the Supreme Court nor this Court has resolved an issue, there can be no plain error in regard to that issue. *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003). The Appellants concede that neither this Court nor the Supreme Court has addressed the constitutional challenge they

---

[18] To the extent that the Appellants contend that their challenge to § 70502(d)(1)(C) is one of subject matter jurisdiction and therefore subject to *de novo* review, we are not persuaded. Although we have construed the "'on board a vessel subject to the jurisdiction of the United States' portion of the MDLEA as a congressionally imposed limit on courts' subject-matter jurisdiction," *United States v. De La Garza*, 516 F.3d 1266, 1271 (11th Cir. 2008), the Appellants are not challenging whether they met the definition of a stateless vessel in § 70502(d)(1)(C), and were therefore subject to the jurisdiction of the United States. Instead, they are arguing that Congress exceeded its authority under the Felonies Clause in enacting the statute and defining a stateless vessel as one for which a nation cannot confirm or deny registry. This argument is a garden variety constitutional attack, which the Appellants should have raised below in order to preserve the issue for appeal. They failed to do so, and thus their claim is subject to plain error review. *Valois*, 915 F.3d at 729 n.7.

22-10576                Opinion of the Court                29

raise.[19]   Accordingly, they cannot show that any error was plain.
*Id.*

---

[19] In support of their argument, the Appellants rely almost exclusively on *United States v. Davila-Reyes*, 23 F.4th 153 (1st Cir. 2022) (*Davila-Reyes II*), a now-withdrawn opinion from the First Circuit, which struck down § 70502(d)(1)(C) as facially unconstitutional. *See United States v. Davila-Reyes*, 38 F.4th 288 (1st Cir. 2022) (granting rehearing en banc and withdrawing *Davila-Reyes II*).

Putting aside the problems inherent in relying on a withdrawn opinion, *Davila-Reyes II* does not help the Appellants because it is not a decision from this Circuit or the Supreme Court, which is a necessary requirement to show error on plain error review. *See United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005) ("When neither the Supreme Court nor this Court has resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue." (quotations omitted)).

Aside from the fact that the Appellants cannot show plain error because there is no decision from this Court or the Supreme Court addressing this issue, we note that the Ninth Circuit recently rejected the argument that § 70502(d)(1)(C) improperly displaces international law because an oral claim of a vessel's nationality constitutes a prima facie showing of nationality, which can only be rebutted by an affirmative denial by the asserted flag state, concluding that "no rule of international law requires this approach." *United States v. Marin*, 90 F.4th 1235, 1242–43 (9th Cir. 2024). Thus, the Ninth Circuit held that "[b]ecause there is no rule of international law speaking to this jurisdictional question, the United States does not overstep the limits which international law places upon its jurisdiction, in choosing to treat vessels as stateless where the claimed nation responds that it can neither confirm nor deny the registry." *Id.* at 1243 (internal citation omitted) (quotations omitted).

## IV.    Conclusion

For the above reasons, the Appellants are not entitled to relief on any of their claims, and we affirm the Appellants' convictions.

**AFFIRMED.**